IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VERNA GREGG,
as Personal Representative of the
Estate of Philmore Roy Davis

    *Plaintiff*,

    *v.*

SERGEANT ERIC
STRAWDERMAN, *et al*.,

    *Defendants*.

Civil Action No. ELH-23-2270

## MEMORANDUM OPINION

Plaintiff Verna Gregg, as Personal Representative of the Estate of Philmore Roy Davis, has

lodged a civil rights suit against four correctional officers who worked at the Baltimore County

Detention Center ("BCDC") on August 23, 2020. On that date, Davis was a "Temporary Detainee"

pending a competency evaluation. The defendants are Sergeant Eric Strawderman, Sergeant

Christopher Fischer, Officer Devin McKeiver, and Officer Matthew Swanke. *See* ECF 32 (Fourth

Amended Complaint).[1]

In particular, plaintiff alleges that Davis was "forcibly" tackled to the ground multiple times

by defendants, ECF 32, ¶¶ 39–73, and was injured when Strawderman "forced" Davis into a

"figure four leg lock." *Id.* ¶ 72. Due to the severity of the injury, Davis underwent "a right through

---

[1] Baltimore County was previously named as a defendant. *See* ECF 1 (Complaint). But, plaintiff has abandoned her claims against Baltimore County. *See* ECF 14 (Second Amended Complaint).

the knee amputation" of the right leg.  *Id.* ¶ 100.  Davis died from cardiac arrest on June 24, 2023, at the age of 66.  ECF 47-9 at 8.[2]  This suit followed on August 18, 2023.  ECF 1.

The Fourth Amended Complaint is the operative complaint. *See* ECF 32.  Gregg alleges claims of battery (Count I); gross negligence (Count II); use of excessive force, pursuant to 42 U.S.C. §§ 1983 and 1988 (Count III); and violations of Articles 24 and 26 of the Maryland Declaration of Rights (Count IV).

Plaintiff filed a post-discovery "Motion for Partial Summary Judgment."  ECF 44.  It is supported by a memorandum of law (ECF 44-1) (collectively, "Plaintiff's Motion") and several exhibits.  ECF 44-2 through 44-26.  In particular, plaintiff seeks summary judgment against Strawderman as to battery (Count 1) and gross negligence (Count II).  As to Strawderman, Swanke, and Fischer, plaintiff seeks summary judgment with respect to use of excessive force claim under 42 U.S.C. § 1983 (Count III) and the Maryland Declaration of Rights (Count IV).[3]

Defendants filed a combined opposition to Plaintiff's Motion and cross motion for summary judgment, seeking summary judgment in favor of all defendants as to all claims.  ECF 47.  It is supported by a memorandum of law (ECF 47-1) (collectively, "Defendants' Motion") and several exhibits.  ECF 47-2 through 47-9.[4]  Thereafter, plaintiff filed a combined opposition to Defendants' Motion and reply as to Plaintiff's Motion.  ECF 48 ("Plaintiff's Opposition").

---

[2] The Court has no information indicating that the death was related to the amputation.

[3] Although plaintiff does not seek summary judgment against McKeiver, she did not ask the Court to dismiss the suit as to him.

[4] The parties submitted separate deposition excerpts.  On occasion, the excerpts overlap.

Defendants failed to include identifying cover sheets for their deposition excerpts. Moreover, both parties failed to provide the Court with courtesy copies of their submissions, as required by L.R. 105(1)(a).  The number of pages for Plaintiff's Motion, with exhibits, totals 284 pages.  Defendants' Motion and exhibits total 214 pages.

Plaintiff's Opposition is supported by additional exhibits. ECF 48-1 through 48-5.[5] Defendants replied. ECF 50 ("Defendants' Reply").

Plaintiff has also moved to strike the report and testimony of defendants' jail operations expert, Jeff Eiser. ECF 49 ("Motion to Strike"). It is supported by eleven exhibits. ECF 49-1 through ECF 49-11. Defendants oppose the Motion to Strike. ECF 51 ("Opposition to Motion to Strike"). Plaintiff did not reply.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant Defendants' Motion as to McKeiver, Swanke, and Fischer, but deny Defendants' Motion as to Strawderman. I shall also deny Plaintiff's Motion. Accordingly, Strawderman is the sole remaining defendant. And, I shall deny the Motion to Strike.

## I.    Factual Background

Davis was arrested in Baltimore County on August 21, 2020, because he refused to leave his single family house after being served with a Temporary Protective Order. ECF 44-6 (Baltimore County Police Department Incident Report), at 2, 4.[6] Davis was 63 years of age at the time. ECF 44-2 (BCDC Full Patient History), at 2.[7]

At Davis's Bail Hearing on August 22, 2020, Baltimore County Commissioner Brian Seippe expressed concern about Davis's mental competency and ordered his temporary

---

[5] For each exhibit that I mention, I include a brief description at least one time. Because of the volume of exhibits, and for the convenience of the reader, I have attached an Appendix that identifies the exhibits referenced in the Memorandum Opinion.

[6] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not necessarily correspond to the page number imprinted on a particular submission.

[7] The police incident report does not include the reasons for the issuance of the Temporary Protective Order. But, it states that Davis "constantly refused" to leave the residence and he "became very belligerent . . . ." ECF 44-6 at 4.

commitment pending a competency evaluation.  ECF 44-7 (District Court for Baltimore County Temporary Commitment), at 2.  Davis entered BCDC at 3:34 a.m. on August 23, 2020, as a "Temporary Detainee."  Ex. 44-10 (Davis Transportation Log), at 2.  BCDC's closed-circuit television footage shows that Davis walked into BCDC without assistance, although he seems to limp on occasion.  ECF 44-11 (BCDC Video Footage).[8]

Upon Davis's arrival at BCDC, he underwent a "Rapid Receiving/Health Assessment," during which Licensed Practical Nurse Latasha Spencer evaluated him.  ECF 44-2 at 2.  Spencer recorded in Davis's medical chart that, *inter alia*, Davis had "bruises, cut, abrasion and scratches on numerous parts of [his] body" (*id.* at 3) and "decay[ed], missing, [and] broken" teeth.  *Id.* at 7.  The medical form asked: "Does the patient appear to exhibit any bizarre or unusual behaviors suggestive of a mental health disorder?"  *Id.* at 3. Spencer answered: "No."  *Id.*

Spencer recorded that Davis was born in January 1957, *id.* at 2; was "Elderly (Age 55 or above)," *id.* at 7; and he stood five feet nine inches tall and weighed 137 pounds.  *Id.* at 2.[9]  I pause

---

[8] This is the only video evidence in the record.  *See* ECF 44-1 at 7 (Davis "was physically intact at the time and walked into the Inmate Processing area under his own power with a normal gait.").  The parties do not discuss the law governing video evidence.

In general, if a party's account of events is contradicted by video evidence, a court should view the facts "in the light depicted by the videotape."  *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also United States v. Kehoe*, 893 F.3d 232, 240 (4th Cir. 2018).  But, *Scott* does not license a court to reject one side's account as a matter of law if the "documentary evidence, such as a video," merely "offers *some* support for [the other side's] version of events."  *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272 (4th Cir. 2011) (emphasis in *Witt*); *see also Sawyer v. Asbury*, 537 F. App'x 283, 291 (4th Cir. 2013), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 396-9 (2015), *as recognized by Brooks v. Johnson*, 924 F.3d 104 (4th Cir. 2019).

[9] Notably, the Baltimore County Police Incident Report (ECF 44-6) reflects that Davis was born in 1975, not 1957.  *Id.* at 3.  It appears that the 5 and the 7 were transposed.  As a result, the report indicates, erroneously, that Davis was only 45 years of age.  *Id.*  It also notes that Davis had a "Build" that was "Small."  *Id.*  But, it attributes to him a weight of 160 pounds, which may have come from Davis's driver's license.  *Id.*  The parties do not address these discrepancies.

to note that defendant McKeiver is 5'10'' tall and, at the time, weighed between 190 and 200 pounds.  ECF 44-3 (McKeiver Deposition), at 4–5.  Defendant Fischer is six feet in height and weighed between 185 and 200 pounds.  ECF 44-4 (Fischer Deposition), at 3–4.  Defendant Strawderman stands at 5'8'' tall and weighed between 180 and 200 pounds.  ECF 44-5 (Strawderman Deposition), at 3.[10]

At 6:09 a.m., McKeiver escorted Davis to the intake changing room, where he instructed Davis to put on a BCDC jumpsuit.  ECF 44-12 (BCDC Shift Narrative), at 2; *see also* ECF 44-3 at 7–8.  In McKeiver's Use of Force Report, which is signed and dated August 23, 2020, he wrote that Davis "started acting bizarre . . . by peeking out of the changing room and pacing back and forth."  ECF 44-13 (McKeiver Force Report), at 2; *see also* ECF 44-3 at 11–13.

According to McKeiver, Davis ran from the changing room past McKeiver.  ECF 44-13 at 2.  In response, McKeiver "secured inmate Davis by using both hands to secure inmate Davis [sic] left and right hands and held him against the wall."  *Id.*; *see also* ECF 44-3 at 15–16.  In McKeiver's Use of Force Report, he stated: "Inmate Davis continue [sic] to resist by attempting to bite at and swung his left hand toward Ofc. McKeiver [sic] facial area."  ECF 44-13 at 2.  Also, "Inmate Davis began screaming loud [sic]."  *Id.*

After "hear[ing] commotion . . . and somebody else screaming," Swanke responded to the scene.  ECF 44-9 (Swanke Deposition), at 14.  Swanke's Use of Force Report is signed and dated August 23, 2020.  ECF 44-14 (Swanke Force Report), at 2.  He witnessed "Officer Mckeiver talking to and attempting to calm inmate Davis down."  *Id.*  Swanke recalled that Davis "bec[a]me aggressive and attempt[ed] to strike and bite Officer Mckeiver in the facial area."  *Id.*  Swanke

---

[10] Neither side provided the height or weight of Swanke.

called for help. ECF 44-9 at 14. And, he "used both hands to gain control of [Davis's] left side," and "applied downward force and guided inmate Davis to the floor onto his stomach." ECF 44-14 at 2. "Officer Mckeiver assisted by controlling [Davis's] left side." *Id.*

McKeiver wrote in his Use of Force Report that he "applied a left arm-bar by placing inmate Davis [sic] right wrist in between [McKeiver's] left bicep and forearm" and "used his right hand to apply slight pressure on inmate Davis [sic] right triceps above the elbow joint to gain compliance." ECF 44-13 at 2. He recalled that, at the same time, "Officer Swanke applied a right arm-bar by placing [Davis's] left wrist in between [Swanke's] right bicep and forearm. Officer Swanke used his left hand to apply slight pressure on inmates [sic] left tricep above the elbow joint to gain compliance." ECF 44-14 at 2.

Sergeant Christopher Fischer heard "loud yelling coming from the changing room area" and also responded to the scene. ECF 44-17 (Fischer Force Report), at 2. In Fischer's Use of Force Report, signed and dated August 23, 2020, he recounted that he "witnessed Ofc. McKeiver and Ofc. Swanke taking inmate Davis down to the ground." *Id.*; *see also* ECF 44-18 (Fischer Intra-Department Correspondence dated 9/29/20), at 2. According to Fischer, Davis was "screaming loudly and attempting to bite Ofc. Swanke." ECF 44-17 at 2. Fischer assisted by "securing [Davis's] legs and giving commands to staff to secure his arms." *Id.*; *see also* ECF 44-4 at 8, 12.

In particular, Fischer secured "Davis's legs by placing inmate Davis's right leg over his left leg and applying forward pressure on his left leg at the natural bend." ECF 44-17 at 2; *see also* ECF 44-4 at 10. Then, "Swanke used both hands to place inmate [Davis's] left hand behind his back to be handcuffed." ECF 44-15 (Swanke Supplement to Incident Report), at 2. Fischer "secured both of inmate Davis's wrists in handcuffs and gave him orders to calm down." ECF 44-

17 at 2.  Notably, from this point on, Davis's hands were cuffed behind his back until emergency medical personnel responded to the scene and asked that Davis's hands be cuffed in the front.  ECF 44-9 at 14; ECF 44-3 at 23; ECF 44-4 at 14, 23; ECF 44-18 at 2.

After "Davis stated he was calm and wanted to see the doctor," Swanke and Fischer "escorted inmate Davis in front of the Medical Triage room and sat him in a chair."  ECF 44-17 at 2.  BCDC protocols require that, when force has been used on an individual, the individual must be seen by medical personnel.  ECF 44-9 at 23.  Fischer recalled at his deposition that Davis was able to walk the approximately fifty steps to the Medical Triage room without any problem.  ECF 44-4 at 19.  Similarly, Swanke testified at his deposition that Davis was able to walk there without "limping or stutter stepping."  ECF 44-9 at 23.

Fischer instructed Davis "to have a seat" and "to calm down" so that he could be examined by Nurse Spencer.  ECF 44-4 at 21.  Davis was still handcuffed behind his back.  ECF 44-9 at 17–18.  While Davis was waiting to be evaluated, he "attempted to stand up and started to scream loudly that staff were trying to kill him."  ECF 44-17 at 2; *see also* ECF 44-8 (Fischer Intra-Department Correspondence, dated 8/23/20), at 2.

Swanke prepared a Supplement to his Incident Report, which is signed and dated August 23, 2020.  ECF 44-15.  He wrote: "Davis became irate and began to actively resist again by trying to stand and pull away from Officer Swanke and [Sergeant] Fischer" and "refused all orders."  *Id.* at 2.  Fischer testified at his deposition that Davis "started getting extremely paranoid" (ECF 44-4 at 13); was "acting erratic[ally]" (*id.* at 24); and "appeared to be in some kind of mental health episode." *Id.*

Because "Inmate Davis would not follow orders to calm down [he] was placed on the floor by Sgt. Fischer and Ofc. Swanke."  ECF 44-17 at 2.  Fischer "used both hands to apply downward

pressure to inmate Davis's right arm forcing him down to the ground." *Id.* At the same time, "Swanke applied a right bent escort hold by placing his right arm underneath and through the left arm of [Davis] until his right hand was on top of [Davis's] left shoulder." ECF 44-15 at 2. Then, Swanke "applied slight downward pressure to bend [Davis] at the waist area." *Id.*

According to Fischer, while Davis was on his stomach, still handcuffed behind his back, he continued to "kick[] his legs" and "pull[] away." ECF 44-4 at 26. Fischer and Swanke were "holding [Davis's] arm[s] down with downward pressure, just trying to control him." *Id.* Fischer described Davis as going "from being calm to extremely paranoid." *Id.* So, he thought "the best course of action [was] to just try to hold him on the ground so he doesn't try to hurt anybody or hurt himself." *Id.* Davis was placed face down, in a prone position, on his stomach, with his hands cuffed behind his back. *Id.* at 25–26. In this position, Davis was unable to punch or head butt the officers but, according to Fischer, he was "licking the floor, biting at [defendants], [and] kicking his legs." *Id.* at 27–28. And, Swanke testified that, during this second takedown, Davis bit Swanke on his left leg. ECF 44-9 at 17.

Sergeant Strawderman responded to Swanke's call for help during the first incident with Davis in the changing room (ECF 44-9 at 13–14), and reported to the Medical Triage room. ECF 47-5 (Strawderman Deposition), at 3. He did not witness the first takedown, but he participated in the second and third takedowns. *Id.* at 4, 39. Strawderman testified that Davis was "already handcuffed" when he arrived at the scene. ECF 44-5 at 6. Moreover, Strawderman was aware that Davis "was a temporary commitment," although he did not know the reason. *Id.* at 5.

Strawderman's Use of Force Report is signed and dated August 23, 2020. ECF 44-19 (Strawderman Force Report). After Strawderman arrived at the Medical Triage room, he watched as Fischer and Swanke attempted to place Davis "in a chair, but due to his erratic behavior," Davis

was placed on the ground for the second time. *Id.* at 2; ECF 47-5 at 3. Strawderman subsequently gained control of Davis's legs. ECF 44-19 at 2. In Strawderman's Use of Force Report, he referred to this maneuver as a "figure four leg lock." *Id.*; *see also* ECF 44-20 (Strawderman Intra-Department Correspondence, dated 9/30/20), at 2. In addition, Strawderman described the technique of the leg lock, stating that he used "his right and left hand crossing inmate Davis's left leg over his right knee and creating a natural upward bend placing his body weight against his right leg to prevent inmate Davis from kicking staff and attempting to get up." ECF 44-19 at 2; *see also* ECF 47-5 at 24; ECF 44-17 at 2. Moreover, Strawderman used his "body weight" to pin Davis's legs so as to prevent Davis from kicking. ECF 44-5 at 18, 22.

At 6:17 a.m. (ECF 44-12 at 2), Strawderman "announced a medical code 2 to help expedite medical staff responding" because of Davis's "irate and incoherent behaviors while remaining combative." ECF 44-15 at 2. Fischer "ordered inmate Davis to calm down" but, according to Fischer, "Davis appeared to be in an altered mental state where he would be calm and then immediately become manic." ECF 44-17 at 2. Then, "inmate Davis stated that he would comply with orders and asked to be sat up." ECF 44-15 at 2. Swanke and Fischer "assisted inmate Davis to his feet and placed him in a chair while they continued to await medical staff's arrival." *Id.* Notably, Fischer and Swanke also continued holding onto Davis's right and left arms, respectively. ECF 44-9 at 29–30.

A third takedown followed. But, there are conflicting accounts as to what happened.

In Swanke's Use of Force Report and Intra-Department Correspondence (ECF 44-16),[11] he wrote that Davis "attempt[ed] multiple times to stand up and pull away from Officer Swanke and

---

[11] Swanke's Intra-Department Correspondence is dated October 8, 2019. Presumably, "2019" is a typographical error, and it should state October 8, *2020*. *See* ECF 44-16 at 2.

Sgt. Fischer." ECF 44-15 at 2; ECF 44-16 at 2. At Swanke's deposition, he testified that Davis began "jumping and lunging towards them." ECF 44-9 at 15. Swanke also testified that Davis was "leaning in the chair" and "throwing his body back and forth." *Id.* at 32–33. But, Swanke was unable to confirm whether Davis's "buttocks actually [came] off of the chair or [if] he [was] just leaning forward" between the second and third takedowns. *Id.* at 29.

Strawderman stated in his Use of Force Report that, prior to the third takedown and "[w]hile waiting for medical staff to respond inmate Davis went into another manic episode and attempted to jump out of the chair." ECF 44-19 at 2. Then, according to Strawderman, "Officer Swanke and Sergeant Fischer gave numerous orders for inmate Davis to remain seated in the chair and wait for medical staff to respond." *Id.*

Similarly, in Strawderman's Intra-Department Correspondence (ECF 44-20), Strawderman noted that, while waiting for medical staff, Davis "went into another manic episode and attempted to jump out of the chair . . . ." *Id.* at 2. Strawderman claimed that Davis also "refused all orders and attempted to break free" from Swanke and Fischer. *Id.* At Strawderman's deposition, he testified that, in defiance of these orders, Davis "jumped out of the chair and he was taken back to the ground." ECF 47-5 at 30; *see also* ECF 44-20 at 2 (stating that Swanke and Fischer "forced" Davis to the floor "to regain control . . . .").

According to Strawderman, Davis "continued to flail [h]is legs in an attempt to kick staff and break free . . . ." ECF 44-20 at 2. Therefore, Strawderman "placed Davis in a figure four leg lock" by "crossing Davis's left leg behind the back of his right knee at the natural bend" and then "plac[ing] Davis's right leg upward while maintaining control . . . ." *Id.* Strawderman acknowledged that, during the figure four leg lock, he "felt a pop." ECF 44-5 at 23. And, Davis's

10

right leg became "weak." *Id.* at 24.   Strawderman released Davis's legs after "Davis seem [sic] to calm down . . . ."  ECF 44-20 at 2.

Fischer wrote Intra-Department Correspondence on August 23, 2020 (ECF 44-8) and September 29, 2020 (ECF 44-18).  In ECF 44-8, Fischer described Davis as "an older inmate."  *Id.* at 2.  And, he was aware that Davis "was a Temporary Commitment due to being incoherent at his initial hearing."  *Id.*  Fischer also stated that before the takedown, Davis was "extremely combative . . . by screaming staff was trying to kill him and pushing his body up out of the chair."  *Id.*

Swanke claimed that Davis "refused all orders."  ECF 44-15 at 2.  At Swanke's deposition, he testified that he "decided to just lay [Davis] down on the ground to keep him from harming himself at that point."  ECF 44-9 at 33.  Swanke "applied a right bent escort hold by placing [Swanke's] right arm underneath and through the left arm of [Davis] until his right hand was on top of [Davis's] left shoulder."  ECF 44-15 at 2.  Then, "Swanke applied slight downward pressure to bend [Davis] at the waist area" and "applied downward pressure while maintaining control and guided inmate Davis to the floor."  *Id.*  And, while Davis was on the floor, Swanke and Fischer continued to control Davis's arms.  *Id.*

According to Fischer, Strawderman "secured inmate Davis's legs due to him kicking at staff again."  ECF 44-17 at 2; *see also* ECF 44-16 at 3.  Fischer recalled that Strawderman placed Davis in a "figure four leg lock by using his right and left hand crossing Davis's left leg behind the back of his right knee at the natural bend.  Sgt Strawderman then placed Davis's right leg upward while maintaining control keeping Davis from kicking staff."  ECF 44-18 at 2.

Shortly thereafter, Nurse Practitioner Noel Stevens arrived.  ECF 44-4 at 21.[12]  Stevens saw Davis on the ground with his legs crossed and his feet towards his buttocks.  ECF 44-22

---

[12] The cover sheet prepared by plaintiff uses the spelling of "Noelle."  ECF 44-22 at 1.

(Stevens Deposition), at 3; ECF 44-2 at 34. Spencer told Stevens that "the reason that [Davis] was on the ground handcuffed" was "because he was combative with the officers." ECF 44-22 at 4. Although Spencer told Stevens that Davis "became combative and use of force was employed," neither Spencer nor Stevens actually witnessed the use of force. *Id.* at 4.

Stevens testified that, while Davis was on the ground after the third takedown, she witnessed Davis "struggling against the officers" and "yelling . . . 'help me, they are trying to kill me.'" *Id.* at 5–6. Stevens sought to "assess [Davis's] mental status," *id.* at 5, but "could not get him to answer any questions as to his name or any information." *Id.* at 6. Swanke wrote in his Supplement to his Incident Report that Davis was "incoherent and non-responsive to [Stevens's] questions" and "during [sic] medical evaluation." ECF 44-15 at 2.

Stevens performed "a quick physical assessment" on Davis and "saw that his [right] knee was grossly deformed, was highly suspect for a dislocation and that he needed to go to the hospital." ECF 44-22 at 6. She affirmed that it was "an obvious deformity." *Id.* at 7. According to Stevens, "when the knee is bent, the bottom of the distal end of the femur should line up on the head of the tibia." *Id.* She observed, *id.*: "And this was out of socket." Stevens instructed a "RN [to] stabilize [Davis's right] knee and advised the custody staff that the inmate needed to be sent out to the hospital. . . ." ECF 44-22 at 8; *see* ECF 44-1 at 34. Stevens noted in Davis's BCDC medical chart: "Spencer noticed that [Davis's] right foot pointing [sic] inward." ECF 44-2 at 34.

At 6:28 a.m., BCDC's central control officer called 911. ECF 44-12 at 2. Paramedic Donald Hawkins responded to BCDC at 6:34 a.m. *Id.* He observed Davis "lying prone with his hands cuffed behind him and his right leg [] being stabilized by a [Certified Nursing Assistant,]

---

However, the court reporter spelled the deponent's first name as "Noel." ECF 44-22 at 2. That is the spelling I have used.

12

who advised she felt like his knee was dislocated." ECF 44-23 (Baltimore County Fire Department Ambulance Report), at 7.  Hawkins noted in the narrative section of the Ambulance Report (ECF 44-23) that Davis's "leg-lower-right" had a "[d]eformity," but also a "Pulse-Normal."  *Id.* at 3. Further, he noted that Davis's leg "appear[ed] to be shortened slightly and rotated medially," but Hawkins "did not feel any dislocation" of Davis's right knee.  *Id.* at 7; *see* ECF 44-24 (Hawkins Deposition), at 3.

Emergency Medical Technician Boucauci also responded to BCDC.  ECF 44-18 at 2; ECF 44-20 at 2.  In response to Boucauci's request, Sgt. Fischer "removed Davis's handcuff from behind his back and reapplied the handcuffs to the front on both wrists . . . ."  ECF 44-18 at 2; *see also* ECF 44-20 at 2.

Davis left BCDC in an ambulance at 6:52 a.m.  ECF 44-8 at 2.  He arrived at the Emergency Department of the Greater Baltimore Medical Center ("GBMC") at approximately 7:20 a.m.  ECF 44-25 (GBMC Medical Records), at 2, 3.  He "was awake and would answer questions [by] saying 'ok.'"  *Id.* at 3.  Shortly thereafter, Davis "became combative, trying to move/flail his arms though one arm was cuffed and his right leg was cuffed."  *Id.*

At GBMC, Davis was evaluated by Dr. David L. Strauss and Nurse Lindsay Murdock. They found "a noticeable deformity [to the right leg] from a likely dislocation at the knee."  *Id.* Because Davis would "not calm down," "became more agitated," "fail[ed] [sic] [his] limbs that we [sic] not handcuffed," and was "combative," GBMC staff gave him several doses of medications, including Haldol, Ativan, and Ketamine.  *Id.*  Then, Dr. Strauss, "the ER physician[,] elected to perform a closed manipulation of the injured extremity."  *Id.* at 9, 10.

Davis also underwent a Computer Tomography ("CT") scan of his right leg, which revealed "a dislocation of the knee."  *Id.*  After the CT scan, Dr. Strauss "reassessed" Davis's right foot and

"discovered" that it was "cold and pulseless." *Id.* [13] Dr. Strauss recorded in the medical records that Davis "was found to have a cold right foot, diminished capillary refill of each toe, and absence of the dorsalis pedis and posterior tibial pulses." *Id.* at 10.

Dr. Strauss then consulted with a vascular surgeon at GBMC, Dr. Clinton Protack, who ordered a CT angiogram. *Id.* at 10, 12. The CT angiogram revealed an "abrupt occlusion of the distal portion of the femoral artery approximately 5 cm above the knee joint, involving the entire popliteal artery," and "occluded segment extends craniocaudally for approximately 12 cm." *Id.* at 13. The report also revealed "Aneurysm of the distal abdominal aorta. Aneurysm of the proximal left common iliac artery." *Id.*

"The operating room refused to proceed with surgery" because Davis's "condition [] was only limb threatening, not life threatening, and did not meet criteria for going to surgery without adequate level of consent." *Id.* Because Davis was "not alert to give consent," Dr. Protack contacted the supervisor at BCDC, who gave his informed consent for Davis to undergo surgery. *Id.* at 12. Around the same time, however, Dr. Protack's supervisor advised, instead, to transfer Davis to the University of Maryland's Shock Trauma Center ("Shock Trauma") for surgery. *Id.* Dr. Strauss subsequently contacted the vascular surgeon at Shock Trauma, who accepted Davis for transfer. *Id.* at 9–10.

At Shock Trauma, Dr. Richard Betzold attended to Davis and diagnosed him with an "ischemic right lower extremity." ECF 44-26 (University of Maryland Medical Center Medical Records), at 2. On August 23, 2020, Davis underwent a "right through knee amputation." *Id.* at 2, 3. Two days later, on August 25, 2020, Davis underwent a revision of his leg amputation, performed by Dr. Joseph Dubose. *Id.* at 3. While at Shock Trauma, Davis was also diagnosed

---

[13] Plaintiff has not brought a claim for medical malpractice.

with bipolar disorder. *Id.* at 7. Medical staff recommended that Davis "have medical and psychiatric follow-up once he returns to his home." *Id.* Davis was discharged from Shock Trauma on September 1, 2020 in "good" and "stable" condition. *Id.* at 2, 8.

Additional facts are included, *infra.*

## II.  Legal Principles

### A.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). "Applying that standard, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party." *Aleman v. City of Charlotte*, 80 F.4th 264, 283–84 (4th Cir. 2023); *see Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990); *Dewberry Eng'rs Inc. v. Dewberry Grp., Inc.*, 77 F.4th 265, 277 (4th Cir. 2023); *Knibbs v. Momphard*, 30 F.4th 200, 206 (4th Cir. 2022); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021); *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). The nonmoving party may avoid summary judgment by demonstrating that there is a genuine dispute of material fact that precludes the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support his factual assertions by "citing to particular parts of materials in

15

the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." But, where the nonmovant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by citing to evidence in the record, or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 201 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042

16

(2004); *see Celotex Corp.*, 477 U.S. at 322–24. The nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted); *see also Anderson*, 477 U.S. at 252; *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017). "Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997) (citations omitted). In short, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also Reddy v. Buttar*, 38 F.4th 393, 403–04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Therefore, in considering a summary judgment motion, the court may not weigh the evidence or make credibility determinations. *Brown v. Lott*, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Knibbs*, 30 F.4th at 207, 213; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 218–19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). In the face of conflicting evidence, such as competing affidavits, a court must deny summary judgment, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *Brown*, 2022 WL 2093849, at *1; *see Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton*

*Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

"Courts in the Fourth Circuit may not consider inadmissible evidence on a motion for summary judgment." *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023) (citing *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)). Therefore, to the extent that evidence amounts to inadmissible hearsay, it "cannot create a factual dispute" for purposes of summary judgment. *Stanton v. Elliott*, 25 F.4th 227, 237 n.7 (4th Cir. 2022) (citing *Md. Highways Contractors Ass'n*, 933 F.3d at 1251); *see also Graves v. Lioi*, 930 F.3d 307, 326 n.15 (4th Cir. 2019) (observing that "hearsay, like other evidence inadmissible at trial, is ordinarily an inadequate basis for summary judgment") (citation and internal quotation marks omitted).

When, as here, the parties have filed cross-motions for summary judgment, the court must "'consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Def. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted); *see Belmora LLC v. Bayer Consumer Care*, 987 F.3d 284, 291 (4th Cir. 2021). In doing so, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Def. of Wildlife*, 762 F.3d at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

In sum, simply because multiple parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate. Indeed, "[b]oth motions must be denied if the court finds that there is a genuine dispute of material fact." 10A C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2720 (4th ed.).

**B.   Section 1983**

Count III of the Fourth Amended Complaint is styled "Deprivation of Rights Under 42 U.S.C.A. § 1983 – Fourteenth Amendment."   ECF 32 at 22.  Section 1983 of Title 42 to the United States Code allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

Under § 1983, a plaintiff may file suit against any person who, acting under the color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Aleman*, 80 F.4th at 284.  However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Graham v. Connor,* 490 U.S. 386, 393–394 (1989); *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey*, 526 U.S. at 707.

To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).  "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

19

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' applicable to Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cnty. v. Dodson*, 454 U.S. 312, 317–18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326, (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

Plaintiff was admitted to BCDC as a "Temporary Detainee." Ex. 44-10 at 2. He was entitled to the same constitutional protections afforded generally to pretrial detainees. Accordingly, defendants' use of force implicates Davis's rights under the Fourteenth Amendment. *See, e.g., Young v. City of Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) (applying Fourteenth Amendment to claims raised by pretrial detainee); *see also Graham,* 490 U.S. at 395 n.10 (1989) (the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment."). Under the Fourteenth Amendment, a detainee must demonstrate that a defendant "inflicted unnecessary and wanton pain and suffering upon the detainee." *Carr v. Deeds*, 453 F.3d 593, 605 (4th Cir. 2006) (citations omitted) (internal quotation marks omitted), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010).

### C. Excessive Force

An excessive force claim implicates the Fourth Amendment to the Constitution. The Fourth Amendment guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The Fourth Amendment is made applicable to the States through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

The Supreme Court has interpreted the Fourth Amendment to prohibit a law enforcement officer from using excessive force to effect a seizure. *See Graham*, 490 U.S. at 394; *Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985); *see also Franklin v. City of Charlotte*, 64 F.4th 419, 530–31 (4th Cir. 2023); *Aleman*, 80 F.4th at 285–87; *Stanton*, 25 F.4th at 233; *Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Hupp v. Cook*, 931 F.3d 307, 320–23 (4th Cir. 2019); *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).

In *Graham*, 490 U.S. 386, the Supreme Court rejected the notion "that all excessive force claims brought under § 1983 are governed by a single generic standard." *Id.* at 393. Rather, the "validity" of an excessive force claim must be "judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." *Id.* at 394.

A claim of excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen" is evaluated "under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* at 395; *see Henry v. Purnell,* 652 F.3d 524, 531 (4th Cir. 2011) (en banc) ("The Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of "seizures effectuated by excessive force. Whether an officer has used excessive force is analyzed under a standard of objective reasonableness.") (internal

21

quotation marks and citations omitted); *see Knibbs*, 30 F.4th at 214 (observing that a "§ 1983 claim that [an officer's] use of force violated [the plaintiff's] Fourteenth Amendment due process rights . . . has been foreclosed by the Supreme Court since 1989") (citing *Graham*, 490 U.S. at 395).

As indicated, Davis was a detainee at BCDC because, at a bail hearing, there were concerns about his mental competency. ECF 44-7 at 2. His status was akin to that of a pretrial detainee.

For a pretrial detainee asserting use of excessive force, "the proper standard comes from the Fourteenth Amendment." *Simmons v. Whitaker*, 106 F.4th 379, 387 (4th Cir. 2024). A detainee may prevail by "providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (citations omitted). In other words, it "is enough . . . that a pretrial detainee show that the 'force purposely or knowingly used against him was objectively unreasonable,' . . . regardless of an officer's state of mind." *Dilworth v. Adams*, 841 F.3d 246, 255 (4th Cir. 2016) (quoting *Kingsley*, 576 U.S. at 397); *see Simmons*, 106 F.4th at 387. A court must consider whether, under the "'facts and circumstances'" of the case, and from the "perspective of a reasonable officer on the scene," the force used against the detainee was objectively excessive. *Kingsley*, 576 U.S. at 397 (quoting *Graham*, 490 U.S. at 396).

In the recent case of *Barnes v. Felix*, 605 U.S. 73 (2025), the Supreme Court reviewed the principles generally applicable to an excessive force claim. The Court explained, *id.* at 79-81 (emphasis added):

> The "touchstone of the Fourth Amendment is 'reasonableness,'" as measured in objective terms. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). So the question . . . is whether the force deployed was justified from "the perspective of a reasonable officer on the scene," taking due account of both the individual interests and the governmental interests at stake. *Graham*, 490 U.S. at 396; *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017).

That inquiry into the reasonableness of police force requires analyzing the "totality of the circumstances." *Id.* at 427–428; *Garner*, 471 U.S. at 9. There is no "easy-to-apply legal test" or "on/off switch" in this context. *Scott v. Harris*, 550 U.S. 372, 382–383 (2007). Rather, the Fourth Amendment requires, as we once put it, that a court "slosh [its] way through" a "factbound morass." *Id.* at 383. Or said more prosaically, deciding whether a use of force was objectively reasonable demands "careful attention to the facts and circumstances" relating to the incident, as then known to the officer. *Graham*, 490 U.S., at 396. For example, the "severity of the crime" prompting the stop can carry weight in the analysis. *See ibid.*; *Garner*, 471 U.S. at 11. So too can actions the officer took during the stop, such as giving warnings or otherwise trying to control the encounter. *See id.* at 12; *Kingsley*, 576 U.S. at 397. *And the stopped person's conduct is always relevant because it indicates the nature and level of the threat he poses, either to the officer or to others. See ibid.*; *Graham*, 490 U.S. at 396.

Most notable here, the "totality of the circumstances" inquiry into a use of force has no time limit. Of course, the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review. But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. Or as the Federal Government puts the point, those later, "in-the-moment" facts "cannot be hermetically sealed off from the context in which they arose." Brief for United States as *Amicus Curiae* 14. Taking account of that context may benefit either party in an excessive-force case. Prior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead they may show why such an officer would have perceived the same conduct as innocuous. The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force.

As indicated, the "'question [is] whether the totality of the circumstances justified a particular sort of . . . seizure.'" *Buchanan*, 325 F.3d at 527-28 (alteration in original) (quoting *Garner*, 471 U.S. at 8–9). "Ultimately, the overarching inquiry is whether the force that was used was proportional under the circumstances." *Nazario v. Gutierrez*, 103 F.4th 213, 234 (4th Cir. 2024); *see Somers v. Devine*, 132 F.4th 689, 698 (4th Cir. 2025); *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020).

Whether an officer's use of force was reasonable under the Fourth Amendment is an objective inquiry. *Kingsley*, 576 U.S. at 395, 397; *see Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); *Benton v. Layton*, 139 F.4th 281, 288 (4th Cir. 2025), *cert. denied*, 2026 WL 79874 (Jan.

12, 2026); *Rambert v. City of Greenville*, 107 F.4th 388, 397 (4th Cir. 2024); *Cybernet, LLC v. David*, 954 F.3d 162, 169 (4th Cir. 2020). The "objective standard adequately protects an officer who acts in good faith." *Kingsley*, 576 U.S. at 399.

Objective reasonableness "turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham*, 490 U.S. at 396); *accord Rambert*, 107 F.4th at 397. "'The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force.'" *Lewis v. Caraballo*, 98 F.4th 521, 531 (4th Cir. 2024) (quoting *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996)). The court must "make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397; *accord deWet v. Rollyson*, 157 F.4th 344, 349 (4th Cir. 2025). Moreover, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

To determine the reasonableness of an officer's actions, a court must conduct "'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham*, 490 U.S. at 396); *accord Pegg v. Herrnberger*, 845 F.3d 112, 120 (4th Cir. 2017). In particular, courts look to several factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the individual] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see Williams v. City of Charlotte,* 2025 WL 841836, at *3 (4th Cir. Mar. 18, 2025) (per curiam); *Quinn v. Zerkle*, 111 F.4th 281, 296 (4th Cir. 2024); *Craven v. Novelli,* 2024 WL 1952590,

24

at *7 (4th Cir. May 3, 2024) (per curiam); *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018); *Connor v. Thompson*, 647 Fed. App'x 231, 236 (4th Cir. 2016); *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 733 (4th Cir. 2013). This standard must be applied in a fact-sensitive manner and not "'mechanically.'" *Lombardo v. City of St. Louis, Missouri*, 594 U.S. 464, 466 (2021) (per curiam) (quoting *Kingsley*, 576 U.S. at 397).

However, these factors are not "exclusive" and "objective circumstances potentially [could be] relevant to a determination of excessive force." *Kingsley*, 576 U.S. at 397. These "circumstances include 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Lombardo*, 594 U.S. at 467 (quoting *Kingsley*, 576 U.S. at 397). So, to prevail, a plaintiff must show that "the use of force is deliberate – *i.e.*, purposeful or knowing." *Kingsley*, 576 U.S. at 396. But, a plaintiff need not prove a defendant's "state of mind." *Id.*

Of relevance, a court may "separately consider non-continuous uses of force during a single incident to determine if all were constitutionally reasonable." *Streater v. Wilson*, 565 F. App'x 208, 211 (4th Cir. 2014). That said, "'[a]rtificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness.'" *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (quoting *Smith*, 781 F.3d at 101).

"At the summary judgment stage, once [the court has] viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law." *Henry*, 652 F.3d at 531 (citing *Scott*, 550 U.S. at 381 n.8); *see Rambert*, 107 F.4th at 396 (stating that "when the historical facts are settled, the question of the objective

25

reasonableness of officers' conduct is a question of law to be decided by the court[]"); *see also Armstrong v. Hutcheson*, 80 F.4th 508, 510 (4th Cir. 2023) ("When the facts are settled . . . the question of objective reasonableness is for the court."). But, "if there are genuine disputes over what happened factually, courts must construe all historical facts in favor of the non-moving party to determine whether the dispute affects the outcome of the claim under the governing law." *Id.* at 514. When the court is determining whether an officer's use of force was reasonable under the Fourth Amendment, "the court must decide, under the nonmovant's version of the facts, the purely legal issue of whether a constitutional violation has occurred." *Id.*

Other legal principles are addressed in the Discussion.

### III. Discussion

### A. Excessive Force

### 1. The Contentions

Count III, lodged pursuant to 42 U.S.C. § 1983, alleges that defendants used excessive force, in violation of the Fourth and Fourteenth Amendments. ECF 44-27 at 1. In particular, plaintiff analyzes defendants' use of force during each of three instances when Davis was taken to the ground. Plaintiff claims that the evidence shows that defendants acted with objectively unreasonable force during the second and third takedowns of Davis. ECF 44-1 at 24–26, 29–31.

According to plaintiff, the use of force was excessive because "[t]here was no need for force at the time the leg lock was applied" (ECF 48 at 9); defendants caused Davis's knee dislocation, which subsequently caused the amputation (*id.*); "Davis did not pose a security problem" (*id.* at 11); "[t]here was absolutely no indication that Davis posed a threat to officer safety or institutional security at the time of either leg lock application by Defendant Strawderman" (*id.*

at 12); and "Davis was not actively resisting" because "[h]is actions reflected confusion and mental distress, and the effect of pain, not aggression" (*id.*).

Further, plaintiff highlights that, at the relevant time, Davis was handcuffed behind his back and thus posed no threat to defendants (*id.* at 5); Swanke and Fischer concede that they maintained control of Davis's arms during the second and third takedowns (*id.* at 7); and Swanke testified at his deposition that Davis was taken to the ground "to protect him from harming himself," rather than out of concern for officer safety. *Id.* at 8 (quoting ECF 44-9 at 33). Moreover, plaintiff contends that defendants are not entitled to qualified immunity. ECF 48 at 15.

For the first takedown, "when [Davis] began to exhibit confusion in the changing room," plaintiff "concedes that this initial use of force is defensible in the context of the instant dispositive motion." ECF 44-1 at 24. But, with regard to this first takedown, plaintiff emphasizes that McKeiver "testified that he physically pinned Mr. Davis against a wall, without assistance," and then "Swanke intercede[d] and assisted in the process of taking Mr. Davis to the ground." *Id.* According to plaintiff, this shows that "[t]here is no factual indication that Mr. Davis was capable of overpowering individual defendants at any time while he was housed in the BCDC." *Id.*

Plaintiff also points out that, after the first takedown, "Mr. Davis was placed in handcuffs," and he "continued with his hands cuffed, behind his back, for the remainder of the subject interactions." *Id.* According to plaintiff, this establishes that, "from that point forward, it was evident to the defendants, including Defendant Strawderman, that Mr. Davis had been rendered unable to strike or punch them." *Id.* (citing ECF 44-5 at 7–9).

According to plaintiff, "the second takedown marks the first clear disparity in the relationship between the alleged need for force and the amount of force that was utilized." ECF 44-1 at 24. Plaintiff asserts that once Davis was seated in the chair at the Medical Triage room, he

"remained subject to close surveillance with Defendants Fischer and Swanke 'watching [him] and standing by.'" *Id.* (quoting ECF 44-4 at 22). Plaintiff contends that defendants' second takedown of Davis occurred because he "appeared to be experiencing 'some kind of mental health episode'" (ECF 44-1 at 24 (quoting ECF 44-4 at 24)), and he "'attempted' to stand up from the gray chair." ECF 44-1 at 24 (quoting ECF 44-8 at 2).

In plaintiff's view, defendants could have "easily avoid[ed] Mr. Davis's head (mouth) and legs (feet) by simply 'moving away from the area in which he could move' those body parts." ECF 44-1 at 25 (quoting ECF 44-9 at 27). Moreover, plaintiff maintains that "Mr. Davis was incapable of escaping the restraint or taking flight, and he posed no risk to staff at the BCDC." ECF 44-1 at 25. Thus, plaintiff posits that "[t]here was no necessity or legitimate reason for the escalation of force" by Strawderman. *Id.* Yet, asserts plaintiff, Strawderman "applied a figure-four leg lock while Mr. Davis was prone, handcuffed, and physically restrained." *Id.* Such use of force, argues plaintiff, was "gratuitous, wanton and patently unreasonable." *Id.*

With respect to the third takedown, plaintiff contends that defendants "crossed the Rubicon." *Id.* Plaintiff emphasizes that Fischer and Swanke "maintained active physical control of Mr. Davis" while he "remained handcuffed and still had no ability to escape the officers or take flight, [and] was not a security risk . . . ." *Id.* Further, plaintiff points to Swanke's deposition, at which "he testified that Mr. Davis was taken to the ground 'to protect him from harming himself.'" *Id.* at 26 (quoting ECF 44-9 at 33). Plaintiff insists that "Mr. Davis was nevertheless subjected to gratuitous force that bore no rational relationship to any penological purpose" when Strawderman "again placed him in a figure four leg lock." ECF 44-1 at 26.[14]

---

[14] Plaintiff stated that Swanke used the figure four leg lock during the third takedown. But, there is no evidence in the record to suggest that Swanke ever placed Davis in a figure-four leg lock. The Court assumes that plaintiff inadvertently referenced Swanke but meant to identify

Plaintiff has provided the expert report of Patrick F. McManimon, Jr., Ph.D., who served as a correctional administrator for 21 years, including as a warden. ECF 48-4 at 2. Dr. McManimon opines: "On more than one occasion during this confrontation, Philmore Davis was controlled at several points during this long confrontation and the infliction of pain and suffering for pain and suffering sake, which is the only conclusion one can draw from the actions of the officers relative to the leg lock and manipulation leading to the injuries causing an amputation and other injuries." *Id.* at 5. According to Dr. McManimon, defendants could have used "restraints, either hard or soft, isolation and observation so as not to have [Davis] harm himself, and the repeated physical contact after gaining control was excessive and could have been prevented." *Id.* In McManimon's opinion, defendants' actions were "contrary to use of force guidelines and procedures taught in most academies" and "appeared wanton and excessive." *Id.*

In support of plaintiff's contention that the element of causation has been satisfied, plaintiff relies on the expert report of Rajabrata Sarkar, MD, PhD, Chief of the Division of Vascular Surgery at the University of Maryland. *Id.* at 27; *see* ECF 44-21 at 1-4 ("Sarkar Report"). Dr. Sarkar opines: "Mr. Davis's injuries were caused when he was held down and subject to the joint manipulations described in the Use of Force reports and Intra-Departmental Communications . . . . " ECF 44-21 at 4.

Further, Dr. Sarkar opines, *id.*: "The dislocation of the knee joint, secondary to the pressure applied against the fulcrum of the opposite leg, resulted in substantial arterial injury and complete thrombotic occlusion of the popliteal artery. Dislocation of the knee is a well-established mechanism of injury of the popliteal artery, and causes a mechanical injury to the intima, or lining of the vessel, which induces thrombosis. The resulting limb ischemia was not reversible at the

Strawderman.

29

time of surgery, and surgical intervention was necessary to include two amputations of the affected limb.  I hold these opinions to a reasonable degree of medical certainty.”

In an addendum of April 7, 2025 (ECF 44-21 at 5-6), Dr. Sarkar also addressed the report of Eric Kraut, M.D., the defense expert.  Plaintiff points out that Dr. Kraut recognized that knee dislocations such as the one suffered by Davis “are extremely rare in low-impact settings and typically result from high-energy trauma events . . . .”  ECF 48 at 13 (boldface omitted).  Indeed, according to plaintiff, Dr. Kraut stated that such a dislocation “‘requires a considerable amount of force to rupture the posterior joint capsule and associated ligaments.’”  *Id.* (quoting ECF 47-9 at 9).[15]  And, according to plaintiff, there is “little doubt: the injury was not the product of a spontaneous or low-level movement but rather the direct result of an excessive and forceful restraint.”  ECF 48 at 14.  She adds: “Courts have consistently held that the use of force against individuals who are restrained and not resisting is unconstitutional.”  *Id.*

In addition, plaintiff disputes that defendants are entitled to qualified immunity.  ECF 44-1 at 28.  She asserts: “Because the conduct attributed to the defendants [is] . . . clearly excessive and violative of the constitution [sic] there can be no claim of immunity in this case.”  *Id.* According to plaintiff, the use of such force, applied to a nonviolent and restrained inmate, is not objectively reasonable.  *Id.* at 28–29.

Conversely, defendants contend that they are entitled to summary judgment.  They argue that their use of force against Davis during the incident was reasonable under the circumstances. ECF 47-1 at 10.

---

[15] The quote does not appear at ECF 47-9 at 9.  Plaintiff appears to misquote Dr. Kraut’s expert report.  It states: “Typically posterior knee dislocations are the result of high-energy injuries and require significant force.”  ECF 47-9 at 9.  It is unclear what plaintiff is actually quoting in her Opposition.

With respect to McKeiver, defendants assert: "Plaintiff makes no claim for summary judgment as to any of [his] conduct and concedes that it was not an unreasonable use of force." *Id.* at 11 (citing ECF 44-1 at 24).

As to Fischer, defendants contend that, for the first takedown, "[g]iven Mr. Davis's behavior, including an attempt to bite one of the officers, the minimal force was needed to control him by immobilizing his legs as [Fischer] was instructed to do so that he could be handcuffed to restrict his ability to strike any officer with his arms was not unreasonable under [the *Kingsley*] factors." ECF 47-1 at 12. With respect to the second takedown, defendants argue that "Officer Fischer's use of force in guiding [Davis] to the ground and then putting pressure on his shoulder while he was 'licking the floor, biting at us, kicking his legs' is likewise not unreasonable . . . ." *Id.* (quoting ECF 44-4 at 28). Defendants continue: "Same too for the third takedown, prompted by what Officer Swanke called Mr. Davis 'throwing his body back and forth' or 'lunging toward staff.'" ECF 47-1 at 12 (quoting ECF 47-3 at 22, 24–25).

Further, defendants contend that Swanke's use of force was not unreasonable. ECF 47-1 at 13. They note that Swanke testified at his deposition that, prior to the first takedown, he saw Davis "'swinging his arms as McKeiver was holding him, and then he was snapping at [McKeiver's] face.'" *Id.* (citing ECF 47-3 at 18). For the second and third takedowns, defendants maintain that "Officer Swanke's use of force mirrored Officer Fischer's," and was necessary "'for everyone's safety,'" including that of Davis. ECF 47-1 at 13 (quoting ECF 47-3 at 12).

Strawderman was not involved until the second takedown. ECF 47-1 at 13. As to the second takedown, Strawderman testified at his deposition that he saw Davis "'turning his head and attempting to bite them.'" *Id.* at 13 (quoting ECF 47-5 at 22). Strawderman explained that the figure-four leg lock is "'designed to stop the individual from basically kicking around and trying

31

to break free from staff, and cause further injury to themselves or staff.'"   ECF 47-1 at 13–14 (quoting ECF 47-5 at 11).  And, Strawderman had "used the leg hold on inmates many times," as instructed.  ECF 47-1 at 14.  Defendants assert, *id.*: "Faced with a mentally unstable detainee attempting to bite other officers Officer Strawderman used the leg hold technique he was taught to control an inmate so that he doesn't kick and injure other officers or himself."

Turning to the third takedown, defendants observe that "Strawderman saw Mr. Davis jump out of the chair, refuse orders to sit, and attempted to pull away from the officers and break free." *Id.*  According to defendants, "Strawderman used the same leg lock technique" that he used during the second takedown.  *Id.*  However, this time, he felt a "pop," which he had "never experienced before when doing that technique."  ECF 47-5 at 39, 42.

Further, defendants posit that "there are not facts leaving no doubt the dislocation *caused* the amputation."  *Id.* at 16 (emphasis in original).  They point to the deposition of Hawkins, the emergency medical technician who responded to BCDC.  *Id.*; *see* ECF 47-8 (Hawkins Deposition).  Defendants note that, at Hawkins's deposition, he testified that he felt a pulse in Davis's leg and did not activate the lights and sirens of the ambulance because he did not deem the situation an emergency.  ECF 47-1 at 16 (citing ECF 47-8).  According to defendants, "it was only after some time at the hospital that 'Mr. Davis was documented to have a cold right foot and absent dorsalis peds and posterior tibial pulses . . . .'"  ECF 47-1 at 16 (quoting ECF 44-1 at 21).

Defendants argue: "Plaintiff's own medical expert concedes that the condition that led to amputation was only 'not reversible *at the time of surgery*.'"  ECF 47-1 at 16 (emphasis added by defendants).[16]  In support of their position, defendants point to the report of their expert, Dr. Kraut

---

[16] In my view, defendants have distorted Dr. Sarkar's statement by adding the word "only."

(ECF 47-9 at 1–22, "Kraut Report"),[17] a general surgeon specializing in trauma and critical care and an assistant professor at Johns Hopkins University. *Id.* at 2. Dr. Kraut opines that it is not possible to clearly define exactly when and how Davis's knee injury occurred. ECF 47-1 at 16 (citing ECF 47-9 at 9). Defendants conclude: "All of this uncertainty regarding the extent of the injury weighs against Plaintiff in factoring in the extent of the injury in the reasonableness calculation." ECF 47-1 at 16.

In addition, defendants argue that they are entitled to qualified immunity. *Id.* at 18. According to defendants, "[t]here were simply no law or facts available to the officers that would have told them that using force as they did was a clear violation of the established precedent." *Id.* at 19. In their view, the cases cited by plaintiff "prove the point" because "[i]n each of those decisions the force used was unreasonable because it was disproportionate when used on a person who was compliant, not resisting or not violent." *Id.*

In contrast, defendants maintain that "Mr. Davis was none of those things." *Id.* They assert: "Plaintiff offers not one case that would have made it clear to Officer Strawderman that using a leg lock—just as he was trained to do – to maintain control of an inmate . . . violated that inmate's constitutional rights." ECF 50 at 6; *see* ECF 47-1 at 18–19.[18]

---

[17] Defendants have combined the expert reports of Dr. Kraut and Jeff Eiser into one exhibit. *See* ECF 47-9. The Kraut Report, which includes Dr. Kraut's report, Curriculum Vitae, and fee schedule, can be found on pages 1 through 22. ECF 47-9 at 1–22. The report of Jeff Eiser is found at pages 23 through 57, and includes Eiser's qualifications and opinions. *Id.* at 23–57.

[18] In Defendants' Reply, they assert that plaintiff "makes no reference whatsoever to the specific conduct" of McKeiver, Fischer, or Swanke in her Opposition, and therefore she has abandoned her claims against them. ECF 50 at 2. In light of my ruling, I need not address this argument or impose such a severe consequence on plaintiff.

## 2. Analysis

I shall examine defendants' use of force against Davis by addressing separately each of the three takedowns.

Plaintiff relies on facts pertaining to the first takedown as context for events that followed. But, plaintiff concedes that, standing alone, the use of force against Davis during the first takedown was "defensible." ECF 44-1 at 24. Moreover, McKeiver was involved only in the first takedown, and plaintiff makes no argument as to McKeiver's liability. Defendants argue, ECF 47-1 at 11:

> This concession is proper given Mr. Davis's conduct, including his attempt to strike and bite Officer McKeiver in the face. Holding his arms and taking Mr. Davis to the ground without injury in an effort to control him is not unreasonable under either the federal or Maryland constitutions. Given Officer McKeiver had no further involvement with Mr. Davis, he is entitled to judgment on all claims against him under Counts III and IV.

In general, plaintiff has not shown the use of excessive force as to the first takedown. Moreover, there is no genuine dispute of material fact regarding the use of force by McKeiver, who was present only for the first takedown. Therefore, McKeiver is entitled to summary judgment.

Plaintiff does not contend that Davis's knee was injured during the second takedown or due to the subsequent leg lock. *See* ECF 44-1 at 11–16. And, the extent of a plaintiff's injury is a relevant consideration. *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994); *see Bailey v. Kennedy*, 349 F.3d 731, 743 (4th Cir. 2003); *Buchanan*, 325 F.3d at 527. Ordinarily, when a plaintiff suffers no injury, the plaintiff has not established an excessive force claim. *See Saucier v. Katz*, 533 U.S. 194, 209 (2001) ("Our conclusion is confirmed by the uncontested fact that the force was not so excessive that respondent suffered hurt or injury."); *see also Wilkins*, 559 U.S. at 38 ("An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim."); *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) (plaintiff

34

"alleges no injury of any magnitude"); *see also*, *e.g.*, *Jones v. Owen,* RSB-24-331, 2025 WL 972250, at *2 (W.D. Va. Mar. 31, 2025) (asserting that "'[i]njury and force . . . are only imperfectly correlated,'" and noting that "the extent of injury suffered by an inmate is still relevant to his excessive force claim, because it may indicate the amount of force applied") (quoting *Wilkins*, 559 U.S. at 38); *Atkins v. Glaser*, LMB-18-354, 2022 WL 1085000, at *7 (E.D. Va. Apr. 11, 2022) (collecting cases).

In my view, plaintiff has not presented a viable excessive force claim as to the second takedown. But, this does not mean that the facts concerning the second takedown are irrelevant. To the contrary, they remain historically pertinent because they provide context for the third takedown, which I address next.

All three defendants had a role in the third takedown. To resolve the question of whether the use of force was excessive as to the third takedown, I must examine each *Graham* factor with respect to Swanke, Fischer, and Strawderman individually.

First, I consider the "severity of the crime at issue." *Graham*, 490 U.S. at 396. Davis was arrested because he refused to leave his home after being served with a Temporary Protective Order. ECF 44-6 at 4. Notably, at his bail hearing, Davis was detained not because of his alleged commission of a crime, but instead for a competency evaluation. ECF 44-7 at 2.

Defendants do not argue that the underlying offense is a consideration in the analysis. "When the subject of a seizure has not committed any crime, this factor weighs heavily in the subject's favor." *Connor*, 647 Fed. App'x at 237 (internal quotation marks and citations omitted) (cleaned up). But, even in a case in which a plaintiff had committed a crime, when the "offense was a minor one," the Fourth Circuit has said that the first *Graham* factor weighs in the plaintiff's favor. *Rowland*, 41 F.3d at 174; *see also Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir.

2002) (holding that this factor "strongly weighed in favor" of plaintiff because officer used force even though plaintiff had committed "insignificant crime").  The Fourth Circuit has also recognized that the first *Graham* factor is intended as a proxy for determining whether "an officer [had] any reason to believe that the [subject of a seizure] was a potentially dangerous individual." *Smith*, 781 F.3d at 102.

As indicated, Davis was detained at BCDC pending a competency evaluation.  The facts reflect that defendants knew of Davis's status as a temporary detainee.  BCDC handled temporary detainees and inmates differently.  Indeed, Swanke testified at his deposition that temporary commitments "can't go with people that [sic] are committed to the facility, so [Davis] would have more than likely stayed in the processing area until he had his bail hearing and they actually committed him to the facility."  ECF 44-9 at 9–10.  Davis's status as a detainee was one of the "facts and circumstances" that "a reasonable officer on the scene" would take into account in regard to the need for the use of force.  *Graham*, 490 U.S. at 396.

Throughout Davis's time at BCDC, he exhibited signs of mental distress, screaming that staff members were trying to kill him, licking the ground, flailing his legs, and attempting to bite defendants.  ECF 44-4 at 28.  Defendants were certainly aware of a mental health concern as to Davis.  Indeed, Strawderman described Davis's behavior as symptomatic of a "manic episode."  ECF 44-19 at 2.

A detainee's mental health is a factor in the use of force analysis.  In *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) ("Armstrong"), the Fourth Circuit said:  "'[T]he use of force that may be justified by' the government's interest in seizing a mentally ill person . . . 'differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community.'"

*Id.* (citation omitted). The Court explained, *id.*: "'The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense.'" (citation omitted); *see Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 904 (6th Cir. 2004) ("It cannot be forgotten that the police were confronting an individual whom they knew to be mentally ill . . . The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted.").

According to defendants, they restrained Davis, in part, "to keep him from harming himself." ECF 44-9 at 33. "Where a seizure's sole justification is preventing harm to the subject of the seizure, the government has little interest in using force to effect that seizure. Indeed, using force likely to harm the subject is manifestly *contrary* to the government's interest in initiating that seizure." *Armstrong*, 810 F.3d at 901 (citing *Drummond ex. Rel Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003)) (italics in *Armstrong*).

Viewing the facts in the light most favorable to plaintiff, defendants were aware that Davis was a detainee who was experiencing a mental health problem. To the extent that the officers took Davis to the ground to prevent a mentally ill detainee from harming himself, that rationale cannot support a level of force that risked substantial harm to Davis. Accordingly, I am satisfied that the first *Graham* factor weighs in favor of plaintiff.

I turn to the second and third *Graham* factors. The second factor asks whether "a reasonable officer" could have perceived that Davis "pose[d] an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. The third factor focuses on whether the individual "is actively resisting arrest or attempting to evade arrest by flight." *Id.*

37

At the relevant time, Davis was handcuffed behind his back.  He was unarmed, elderly, and small in stature.  But, he was able to stand up from the chair in which he was seated.  ECF 47-5 at 33.  Defendants allege that, prior to being taken to the ground for the third time, Davis "attempted to stand up and started to scream loudly that staff were trying to kill him."  ECF 44-8 at 2.  Davis supposedly "jumped up and he was twisting his body attempting to get Officer Swanke and Sergeant Fischer's hold off of him."  ECF 47-5 at 33.  Defendants also claim that Davis failed to comply with their directives.  ECF 44-8 at 2; ECF 44-9 at 28; ECF 47-5 at 33.

The evidence as to who was in the vicinity of Davis at the time of the third takedown, other than the officers, is not clear.  Defendants state in their Reply: "The problem was even more acute because medical staff, who are not corrections officers, were also present and their safety was potentially at risk."  ECF 50 at 5.  But, defendants cite no evidence to support the assertion that others were either present with Davis or unable to move away from Davis.

Nevertheless, in the light most favorable to defendants, a reasonable officer, faced with a detainee who was experiencing a mental health crisis, could have perceived that Davis posed a safety threat when he stood up from the chair and allegedly attempted to pull away from the officers.  Swanke and Fischer were entitled to use reasonable force against Davis, in the form of taking him to the ground, to prevent harm to Davis and others, to prevent Davis's flight, and to secure his compliance with instructions.  Notably, there is no indication of any injury to Davis when Swanke and Fischer took him to the ground.  Thus, I find that the second and third *Graham* factors weigh in favor of Swanke and Fischer with respect to the third takedown.

As to Strawderman's use of the figure-four leg lock following the third takedown, Strawderman contends that it was reasonable force.  He maintains that the force used was calculated to prevent harm to the officers and Davis.  ECF 47-1 at 13–14.

As mentioned, Strawderman described the leg lock in his Use of Force Report, stating that the figure four leg lock consisted of "crossing inmate Davis's left leg over his right knee and creating a natural upward bend placing his body weight against his right leg." ECF 44-19 at 2. Further, at his deposition, Strawderman said, ECF 47-5 at 8: "So we'll say take the left leg, place it at the natural bend at the right knee or vice versa, and then you bring the right leg in just a natural bend and push it forward. Then that, basically the right heel is going towards your buttocks." Moreover, Strawderman testified: "I used my body weight to keep [Davis] from kicking." *Id.* at 31. He continued: "And when I felt like [Davis] was settling down and compliance was being gained, I actually leaned back and released the pressure on him." *Id.* at 32.

At Strawderman's deposition, he stated that he had performed the leg lock maneuver perhaps "hundreds of times, it could be 50-plus times." *Id.* at 28. The figure-four leg lock that Strawderman performed on Davis during the second takedown "did not injure Mr. Davis and Officer Strawderman eased the pressure once [Davis] began to calm down." ECF 47-1 at 14. With respect to the third takedown, however, although Strawderman "used the same leg lock technique" he had used previously, on this occasion he "felt a 'pop,' something he had 'never experienced before when doing that technique.'" *Id.* (quoting ECF 47-5 at 39, 42).

According to defendants, Davis's injury in connection with the third takedown is "[t]he only distinction" between the third takedown and the two earlier takedowns. ECF 47-1 at 14. They argue that although Davis's knee was dislocated when Strawderman used a figure-four leg lock during the third takedown, "the mere fact that Mr. Davis was injured and the injury led to amputation, does not point to unreasonable use of force . . . ." *Id.* at 15. Defendants assert: "'While the degree of injury inflicted may be evidence of the amount of force used in effecting the arrest, and thus the reasonableness of the seizure, it is never determinative of the question whether there

has been a constitutional violation.'" *Id.* (quoting *Hart v. Evans*, DKC-6-1180, 2008 WL 11509634, at *1 (D. Md. June 12, 2008)). Defendants also cite *Estate of Green v. City of Annapolis*, MJM-24-1351, 2025 WL 1029555 (D. Md. Apr. 7, 2025), in which the defendants' conduct was alleged to have resulted in Green's death. Examining the extent of plaintiff's injury, the court wrote: "While this factor, standing in isolation, weighs in favor of finding excessive force, all other *Kingsley* factors demonstrate the need and proportionality of the defendants' conduct and weigh against a plausible finding that the use of force . . . was objectively unreasonable." *Id.* at *10.

That Strawderman had previously performed figure-four leg locks "hundreds of times," without incident, does not establish that the force was reasonable. Moreover, "the extent of injury suffered by an inmate is [] relevant to his excessive force claim, because it may indicate the amount of force applied." *Jones*, 2025 WL 972250, at *2. And, unlike in *Green*, 2025 WL 1029555, at *10, other factors do not "demonstrate the need and proportionality of defendants' conduct." Indeed, the defense overlooks several important and undisputed facts.

To begin, Davis, a detainee, was 63 years old, experiencing obvious mental health issues. At the relevant time, he was handcuffed behind his back, and was laying on the floor in a prone position. It is also salient that when Strawderman applied the figure-four leg lock, Swanke and Fischer were restraining Davis on the floor.

Moreover, Davis weighed only 137 pounds. ECF 44-2. Although Strawderman would not have known Davis's weight, the video reflects a man of slight stature. *See* ECF 44-11; *see also* ECF 44-2; ECF 44-6. In contrast, Strawderman and Fischer weighed between 180 and 200 pounds. ECF 44-4 at 3-4; ECF 44-5 at 3.[19] And, the Fourth Circuit has considered "the size and stature of the parties involved" in its use of force analysis. *Dolgos*, 884 F.3d at 180–181.

_____

[19] As indicated, McKeiver was not present for the third takedown and, Swanke's weight

As justification for the use of the leg lock, Strawderman cites to the risk of harm to the officers because Davis was attempting to bite and kick the officers. ECF 47-1 at 14. But, as noted, Swanke and Fischer were holding Davis on the ground before the figure-four leg lock was applied. Swanke testified at his deposition that Davis was "essentially controlled" (ECF 44-9 at 32) and "there was no risk that he would have gotten away from" defendants during the second and third takedowns. *Id.* And, it is well settled that, after police have gained control of an individual, and the individual is secured, the police cannot continue to use disproportionate force. *See*, *e.g.*, *Valladares v. Cordero*, 552 F.3d 384, 390-91 (4th Cir. 2009); *Kane v. Hargis*, 987 F.2d 1005, 1008 (4th Cir. 1993) (per curiam). It follows that, if Davis was incapable of escaping the grip of Swanke and Fischer, the figure-four leg lock was entirely unnecessary.

It is also noteworthy that Davis was indoors at a correctional facility, which means that fleeing would not be easy. And, of import, the officers certainly could have moved away from Davis's flailing legs and his roving mouth, so as to avoid being kicked or bitten.

On the facts alleged by plaintiff, a jury could readily conclude that, when Strawderman applied the leg lock, Davis did not pose a threat to the safety of himself or others, so as to warrant the use of the figure-four leg lock. A jury could also regard the claim of concern for the safety of others and the officers as self-serving and specious, given that Davis was handcuffed and on the floor in a prone position, restrained by two other correctional officers.

*Armstrong*, 810 F.3d 892, also provides guidance. There, the Fourth Circuit reviewed the district court's grant of summary judgment to the defense in a case in which police officers attempting to execute an involuntary commitment order used a taser multiple times on a mentally ill man who was non-violent. *Id.* at 897, 906. He died as a result. *Id.* at 898.

---

was not provided.

41

At the relevant time, Armstrong was seated outdoors, on the ground, "hugging" a signpost, and surrounded by six people, including three police officers and two hospital security officers. *Id.* at 897, 906.  The Court characterized Armstrong as "a mentally ill man being seized for his own protection."  *Id.* at 906.  In its view, with Armstrong seated on the ground, "[a] reasonable officer would have perceived a static stalemate with few, if any, exigencies—not an immediate danger so severe that the officer must beget the exact harm the seizure was intended to avoid."  *Id.* The Court concluded that the officers' use of the taser constituted excessive force under the Fourth Amendment.  *Id.*

Of import, the Court observed: "Mental illness, of course, describes a broad spectrum of conditions and does not dictate the same police response in all situations.  But 'in some circumstances at least,' it means that 'increasing the use of force may . . . exacerbate the situation.'" *Id.* at 900 (citation omitted).  Pertinent here, the Court said, *id.*: "'The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted.'" (Quoting *Champion*, 380 F.3d at 904).  Further, the *Armstrong* Court instructed, 810 F.3d at 900 (citation omitted): "[O]fficers who encounter an unarmed and minimally threatening individual who is exhibit[ing] conspicuous signs that he [i]s mentally unstable 'must de-escalate the situation and adjust the application of force downward.'"  (First alteration added; second and third alterations in *Armstrong*).  And, the Court recognized that "'the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance . . . are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense.'"  *Id.* (citing *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010)).

With respect to the second and third *Graham* factors, the Court in *Armstrong* emphasized that "[t]he degree of force necessary to prevent an individual who is affirmatively refusing to move from fleeing is obviously quite limited." *Id.* at 901. The Court also addressed the fact that Armstrong was "resisting the seizure." *Id.* In effect, the Court indicated that resistance is not a one size fits all circumstance. It said, *id.* at 901–02:

> Noncompliance with lawful orders justifies some use of force, but the level of justified force varies based on the risks posed by the resistance. *See Bryan*, 630 F.3d at 830 ("'Resistance,' however, should not be understood as a binary state, with resistance being either completely passive or active . . . . Even purely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.") And, here, the factual circumstances demonstrate little risk— Armstrong was stationary, non-violent, and surrounded by people willing to help return him to the Hospital. That Armstrong was not allowing his arms to be pulled from the post and was refusing to comply with shouted orders to let go, while cause for some concern, do not import much danger or urgency into a situation that was, in effect, a static impasse.

Moreover, the Court pointed out that "different seizures present different risks of danger." *Id.* at 904 (citing *Parker v. Gerrish*, 574 F.3d 1, 9 (3rd Cir. 2008) ("Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault.")). The Court observed that it has consistently "declined to equate conduct that a police officer characterized as resistance with an objective threat to safety entitling the officer to escalate force." *Armstrong*, 810 F.3d at 905. As the Court put it, *id.* (emphasis in original), "a police officer may *only* use serious injurious force, like a taser, when an objectively reasonable officer would conclude that the circumstances present a risk of immediate danger that could be mitigated by the use of force. At bottom, 'physical resistance' is not synonymous with 'risk of immediate danger.'[]"

*Armstrong* also makes clear that the lawful use of force must be "deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be

43

mitigated by the" force. *Id.* at 903. In examining the proportionality of the defendants' response, the Court said that Fourth Circuit "precedent [] makes clear that tasers are proportional force *only* when deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the taser." *Id.* at 903 (emphasis in *Armstrong*). Of import, the Court stated: "While the questions whether an arrestee has been restrained and is complying with police directives are, of course, relevant to any inquiry into the extent to which the arrestee 'pose[s] a continuing threat to the officers' safety,' they are not dispositive." *Id.* at 903–04 (quoting *Meyers*, 713 F.3d at 733) (alteration in *Armstrong*). Indeed, said the Court, "even noncompliance with police directives and nonviolent physical resistance do not necessarily create 'a continuing threat to the officers' safety.'" *Armstrong*, 810 F.3d at 904 (quoting *Meyers*, 713 F.3d at 733).

Nonetheless, despite concluding that the use of force against Armstrong was excessive, the Court determined that the officers were entitled to qualified immunity. It reasoned that the law at the time did not clearly establish that the use of the taser was unconstitutional. *Id.* at 903, 909. But, that was in 2016, not 2020.

To be sure, Davis was not tased. But, the principles articulated by *Armstrong* are pertinent in terms of the force applied to a detainee with a conspicuous mental health problem, who is unarmed, distraught, surrounded by correctional officers, and who was causing a disturbance, but whose alleged physical resistance was "not synonymous with 'risk of immediate danger.'[]". *Armstrong*, 810 F.3d at 905.

The Fourth Circuit's analysis of the use of force in *Meyers*, 713 F.3d 723, also provides guidance. *Meyers,* another death case, also involved tasing of a mentally ill person. Police officers

44

entered the residence of Ryan Meyers,[20] "responding to a report of domestic violence involving Ryan and members of his family." *Id.* at 726. Ryan was forty years old at the time. *Id.* at 727. He "had been diagnosed with bipolar disorder at the age of fifteen, and struggled with this mental illness throughout his adulthood." *Id.* At the time of the encounter, Ryan was six feet tall and weighed about 260 pounds. *Id.* at 728.

When the first officer arrived at the Meyers residence, he found Ryan's father and brother in the front yard. *Id.* at 727. Ryan's father was "holding a towel against his face to cover a laceration on his nose, which also was swollen." *Id.* Ryan's father informed the police officer that "Ryan was inside the home, and that [Ryan's mother] had fled and would not return until the police had removed Ryan from the premises." *Id.* From the police officer's "vantage point on the porch of the residence," he "could see that Ryan was pacing inside the house carrying a baseball bat." *Id.* Ryan's brother informed the officer that before Ryan's mother called the police, a fistfight between the brothers had taken place. *Id.* Ryan's brother also informed the officer that Ryan was "bipolar" and had mental health issues. *Id.*

Ultimately, two other officers arrived at the residence, one of whom was "trained to use a taser[.]" *Id.* The officers entered the home and one of the officers "ordered Ryan to drop the baseball bat." *Id.* at 728. According to Ryan's brother, one of the officers then "deployed his taser almost immediately after ordering Ryan to drop the bat, without giving Ryan time to comply with the officer's command." *Id.*

"[I]t is undisputed that Ryan was holding the bat when he first was struck by the taser's probe, and that Ryan may have taken a step toward the officers immediately before the probe made

---

[20] Like the Fourth Circuit in *Meyers,* 713 F.3d 723, I will refer to Ryan Meyers by his first name.

contact with his body." *Id.* After the first taser shock, Ryan "did not drop his bat or fall to the floor[.]" *Id.* The tasing officer claimed that after the first shock, "Ryan was still holding the baseball bat and took two more steps toward the officers." *Id.* But, according to Ryan's brother, "Ryan went into convulsions and exclaimed, 'I give up. I give up. Stop. Stop. I give up.'" *Id.* The officer tased Ryan again, causing him "to drop his bat", although Ryan remained "standing and again advanced toward the officers." *Id.* Then, the officer tased Ryan a third time, causing Ryan "to fall to the ground." *Id.*

After Ryan fell to the ground, three officers "sat on Ryan's back." *Id.* Then, the officer tased Ryan for a fourth time. *Id.* The officer then changed the taser's mode and, during a period of slightly more than one minute, "delivered six additional shocks to Ryan, which each lasted between two and four seconds." *Id.* After Ryan was tased for the tenth time, "the officers observed that Ryan appeared to be unconscious." *Id.* at 729. An ambulance arrived and found "Ryan in a state of cardiac arrest" and were unable to revive him. *Id.*

Ryan's parents brought suit under § 1983, alleging that "the officers' actions leading to Ryan's death violated his Fourth Amendment rights" and Maryland law. *Id.* The district court (Legg, J.) "held that all three officers involved in the incident were entitled to qualified immunity and awarded summary judgment in their favor." *Id.*

On appeal, the Fourth Circuit determined that the district court erred in awarding summary judgment "in favor of the officer who repeatedly activated his taser at Ryan." *Id.* The Fourth Circuit reached this conclusion based on its determination that: "(1) the one officer's use of the taser was not objectively reasonable after Ryan ceased actively resisting arrest; and (2) a reasonable person in the officer's position would have known that the use of a taser in such circumstances violated clearly established constitutional rights." *Id.*

The Fourth Circuit concluded that the officer's "first three uses of the taser were objectively reasonable and did not violate Ryan's Fourth Amendment rights." *Id.* at 773. It reasoned that, "[d]uring the period that" the officer "administered the first three taser shocks, Ryan was acting erratically, was holding a baseball bat that he did not relinquish until after he received the second shock, and was advancing toward the officers until the third shock caused him to fall to the ground." *Id.* Therefore, the Court ruled that "Ryan posed an immediate threat to the officers' safety, and was actively resisting arrest." *Id.*

However, as to the additional seven taser shocks that were deployed against Ryan, the Fourth Circuit determined that the officer was not entitled to qualified immunity. *Id.* at 733–35. Of import, the Court stated: "It is an excessive and unreasonable use of force for a police officer repeatedly to administer electrical shocks with a taser on an individual who no longer is armed, has been brought to the ground, has been restrained physically by several other officers, and no longer is actively resisting arrest." *Id.* at 734. Moreover, the Court recognized that it was clearly established that "'officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity.'" *Id.* at 734 (quoting *Bailey,* 349 F.3d at 744–45). Because "Ryan was unarmed and effectively was secured with several officers sitting on his back," the Court was of the view that "the seven additional taser shocks administered" by the officer "were clearly 'unnecessary, gratuitous, and disproportionate.'" *Id.* at 735 (quoting *Bailey*, 349 F.3d at 744–45). Therefore, it ruled that the district court erred in finding that the officer was entitled to qualified immunity. *Id.* at 735. And, it remanded the case to the District Court for further proceedings.[21]

---

[21] By the time of the remand, Judge Legg had retired. The case was reassigned to me for trial.

47

*Rowland*, 41 F.3d 167, is also instructive.  There, an officer "used disabling force to gain control over" the plaintiff, who was suspected of stealing a five-dollar bill.  *Id.* at 171. The parties "differ[ed], however, on who initiated the use of force and on the nature of resistance offered." *Id.* at 171–72. According to the officer, the plaintiff "shoved him in an attempt to escape, whereupon the officer grabbed [the plaintiff] by the collar." *Id.* at 172. In contrast, the plaintiff "contend[ed] that, without any provocation, [the officer] grabbed his collar and jerked him around, yelling harshly as he did so." *Id.* When the plaintiff "instinctively tried to free himself," the officer "punched him and threw him to the ground." *Id.* The officer then subdued plaintiff using a "wrestling maneuverer" that caused the plaintiff's knee to "crack[ ]." *Id.*

The Fourth Circuit emphasized the importance of "assess[ing] the objective reasonableness of force . . . in full context, with an eye toward the proportionality of the force in light of all the circumstances."  *Id.* at 173.  Moreover, the extent of injury weighed in favor of a finding of objectively unreasonable force.  *Id.* at 174.

In the Court's view, "no reasonable officer could have believed his conduct to be lawful in light of the circumstances known to him at the time."  *Id.*  The Court reasoned, *id.*:

> There never has been any suggestion that Rowland was armed or that Perry suspected he might be. Nor is there any real evidence that this relatively passive, retarded man was a danger to the larger, trained police officer. Finally, while there is some evidence that Rowland offered resistance, the facts on this point are disputed. Rowland maintains that he resisted only to the extent of instinctively trying to protect himself from the defendant's onslaught.

Here, as in *Rowland*, 41 F.3d at 174, there is no "real evidence" that Davis posed an actual danger to the correctional officers or others.  He was unarmed, in handcuffs, restrained by two other officers, and experiencing an obvious mental health issue.  Yet, while Davis was already handcuffed, with his hands behind his back, laying in a prone position on his stomach, and restrained by two other officers, Strawderman proceeded to apply the figure-four leg lock.

48

Davis's alleged physical resistance was, at worst, "minimum, non-violent resistance," *Armstrong,* 810 F.3d at 908, or "non-dangerous, non-active[] resistan[ce]". *Lewis*, 98 F.4th at 534. A reasonable officer would not have "'any reason to believe that [the arrestee] was a potentially dangerous individual' or 'was at all inclined to cause [the officer] any harm.'" *Armstrong*, 810 F.3d at 905 (quoting *Smith*, 781 F.3d at 102) (alterations in *Armstrong*). Indeed, the officers only had to move out of range of Davis's legs and mouth to avoid being kicked or bitten.

In the light most favorable to plaintiff, Swanke and Fischer took Davis to the ground for the third time while he was experiencing a mental health episode, attempting to stand up from a chair, screaming, and supposedly not following orders. Their use of force, *i.e.*, taking Davis to the ground, was objectively reasonable and proportionate. They are entitled to summary judgment with respect to Count III. In contrast, in the light most favorable to plaintiff, and based on the facts outlined above, Strawderman's figure-four leg lock was not an objectively reasonable and proportional use of force in connection with the third takedown. Crediting plaintiff's version of the facts, Strawderman knew that Davis was an elderly detainee, mentally ill, unarmed, handcuffed behind his back, prone on the floor, diminutive in size, and restrained by two other officers.

In regard to Plaintiff's Motion, viewing the facts in her favor, Strawderman contends that he was "[f]aced with a mentally unstable detainee, who was repeatedly refusing to remain calm and cooperate, who was screaming, biting, kicking, and licking the floor, [and he] used the minimal force necessary, [and] the force [he] had been trained to use in such situations . . . , and had used perhaps hundreds of times." ECF 47-1 at 19. According to defendants, "[t]here is no evidence that Officer Strawderman intentionally did anything to cause the injury" and, "at most," Gregg "can prove he was negligent and somehow incorrectly employed the technique he had been trained in.[]" *Id.* at 16. They posit: "Whether officers acted consistent with their training or policy is an

49

appropriate factor to consider when determining whether force was reasonable." *Id.* n.2 (citing *Raiche v. Pietroski*, 623 F.3d 30, 37 (1st Cir. 2010); *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995); *Wyatt v. Owens*, 317 F.R.D. 535, 542 (W.D. Va. 2016); *King v. Taylor*, 944 F.Supp.2d 548, 556 (E.D. Ky. 2013)).

Viewing the facts in the light most favorable to Strawderman, plaintiff has not established that she is entitled to summary judgment against Strawderman on the ground that his conduct was objectively unreasonable as to the use of the leg lock after the third takedown. There are genuine disputes of material fact essential to the determination of whether Strawderman's use of force was reasonable, including the extent of Davis's resistance.

For the foregoing reasons, I shall grant Defendants' Motion with respect to McKeiver, Swanke, and Fischer as to Count III, but deny Defendants' Motion as to Strawderman. I shall also deny Plaintiff's Motion as to Swanke, Fischer, and Strawderman with regard to Count III.

### B. Qualified Immunity

#### 1.

Even assuming the use of excessive force, defendants assert that they are entitled to qualified immunity. ECF 47-1 at 18. Defendants posit: "There were simply no laws or facts available to the officers that would have told them that using force as they did was a clear violation of the established precedent." ECF 47-1 at 19. Given my rulings as to McKeiver, Swanke, and Fischer, I need only address the issue of qualified immunity as to Strawderman.

"Qualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Barrett v. PAE Government Servs., Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S.

48, 62–63 (2018)) (cleaned up); *see Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021) (per curiam); *City of Tahlequah Okla. v. Bond*, 595 U.S. 9 (2021) (per curiam); *Taylor v. Riojas*, 598 U.S. 7, 7–10 (2020); *Reichle v. Howards*, 566 U.S. 658, 664 (2012).  A legion of Fourth Circuit rulings are to the same effect.  *See*, *e.g.*, *Benton*, 139 F.4th at 292; *Wells v. Fuentes*, 126 F.4th 882, 889 (4th Cir. 2025); *Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024); *Thurston v. Frye*, 99 F.4th 665, 673 (4th Cir. 2024); *Lewis*, 98 F.4th at 530; *Hulbert v. Pope*, 70 F. 4th 726, 732 (4th Cir. 2023); *Franklin v. City of Charlotte*, 64 F.4th 419, 530, 534–35 (4th Cir. 2023); *Hicks v. Ferreyra*, 64 F.4th 156, 169 (4th Cir. 2023); *Stanton*, 25 F.4th at 233; *Davison v. Rose*, 19 F.4th 626, 640 (4th Cir. 2021); *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021); *Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, 584 U.S. 1013 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016); *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015); *Meyers v. Baltimore*, 981 F. Supp. 2d 422, 429 (D. Md. 2013).

The doctrine of qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Fourth Circuit has explained: "'Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Garrett v. Clarke*, 74 F.4th 579, 583 (4th Cir. 2023) (quoting *Davison*, 19 F.4th at 640); *see also King v. Riley*, 76 F.4th 259, 264–65 (4th Cir. 2023); *Owens v. Balto. City State's Attorneys Office*, 767 F.3d 379, 395 (4th Cir. 2014).

Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see Atkinson*, 100 F.4th at 504; *Hicks*, 64 F.4th at 169; *Barrett*, 975 F.3d at 428–29; *Betton*, 942 F.3d at 190; *Wilson*, 893 F.3d at 219; *Smith*, 781 F.3d at 100. An official who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). In other words, the doctrine affords "government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam). But, "[q]ualified immunity does not permit law enforcement to act with impunity, throwing our nation's constitutional commitments to the winds of individual discretion." *Somers*, 132 F.4th at 695.

Numerous cases support these principles. *See, e.g., Reichle*, 566 U.S. at 664; *Saucier*, 533 U.S. at 206; *Atkinson*, 100 F.4th at 504; *Robertson v. Anderson Mill Elem. School*, 989 F.3d 282, 288 (4th Cir. 2021); *Ray*, 948 F.3d at 229–30; *Hupp*, 931 F.3d at 317; *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582–83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

To determine whether qualified immunity applies, courts generally conduct a two-step inquiry. *Saucier*, 553 U.S. at 201; *Benton*, 139 F.4th at 288; *Atkinson*, 100 F.4th at 504; *Thorpe v. Clarke*, 37 F.4th 926, 933 (4th Cir. 2022); *Est. of Jones v. City of Martinsburg*, 961 F.3d 661, 667 (4th Cir. 2020); *King,* 76 F.4th at 265; *Hicks*, 64 F.4th at 169; *Martin v. Short*, 2024 WL 3200715, *2 (4th Cir. 2024). First, the court asks whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the [official's] conduct violated a constitutional [or statutory] right[.]" *Saucier*, 533 U.S. at 201. Second, the court asks whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable [official] that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see also Cannon v. Village of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018); *Scinto*, 841 F.3d at 235. "If the initial prong is satisfied, [the court] evaluate[s] whether the right at issue was clearly established at the time of the officer's conduct." *Wilson*, 893 F.3d at 219. "Accordingly, even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Id.* (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)) (alteration in *Wilson*).

"The plaintiff bears the burden of proof on the first question—i.e., whether a constitutional violation occurred . . . [and] [t]he defendant bears the burden of proof on the second question—*i.e.*, entitlement to qualified immunity." *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007) (en banc) (internal citations omitted); *see also Atkinson*, 100 F.4th at 504; *Thurston*, 99 F.4th at 673; *Stanton*, 25 F.4th at 233. Although "'[c]ourts are no longer required to analyze these

questions sequentially, . . . it is often the better approach' to 'determine first whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *Dolgos*, 884 F.3d at 178 (internal citation omitted).[22]

Qualified immunity is an affirmative defense. *Hicks*, 64 F.4th at 169; *Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 305 (4th Cir. 2006). But, it does not merely provide a defense to liability. Rather, it provides "*immunity from* suit . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in *Mitchell*); *see Gilliam v. Sealey*, 932 F.3d 216, 229 (4th Cir. 2019), *cert. denied,* 589 U.S. 1305 (2020)*; see also Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526).

As indicated, if an official is shown to have violated the rights of a plaintiff, the court must "evaluate whether the right at issue was 'clearly established' at the time of the [official's] conduct." *Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).

"The inquiry into whether a constitutional right is 'clearly established' requires defining the right at issue." *Hicks*, 64 F.4th at 170; *see Atkinson*, 100 F.4th at 504; *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022); *Halcomb*, 992 F.3d at 319–20.  "The Supreme Court has cautioned against defining a right with 'a high level of generality'. . . ." *Hicks*, 64 F.4th at 170 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)); *see City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019); *White v. Pauly*, 580 U.S. 73, 79 (2017); *Younger v. Crowder*, 79 F.4th 373, 385 (4th Cir.

---

[22] The Fourth Circuit has "effectively done away with the clearly established prong of qualified immunity for a subset of deliberate indifference cases," *Younger v. Crowder*, 79 F.4th 373, 385 n.17 (4th Cir. 2023), namely, cases in which an alleged "Eighth Amendment violation[] inherently include[s] knowing disregard for the law." *Pfaller v. Amonette*, 55 F.4th 436, 445–48 (4th Cir. 2022); *see Thorpe*, 37 F.4th at 939.

2023). "Defining the right at a high level of generality, 'avoids the crucial question whether the offic[er] acted reasonably in the particular circumstances that he or she faced.'" *Atkinson*, 100 F.4th at 505 (citation omitted) (alteration in *Atkinson*); *see Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). Therefore, the court must "define the right at issue with specificity." *Knibbs*, 30 F.4th at 223.[23]

"'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (internal citations and quotation marks omitted); *see Thurston*, 99 F.4th at 678 ("[A] right is only clearly established if it has a 'sufficiently clear foundation in then-existing precedent.'") (quoting *Wesby*, 583 U.S. at 63); *see also Atkinson*, 100 F.4th at 505; *King*, 76 F.4th at 265; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018). Put another way, the "clearly established" standard "requires that the contours of the legal rule be 'so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Garrett*, 74 F.4th at 584 (quoting *City of Tahlequah*, 595 U.S. at 12 (internal quotation marks omitted)); *see Nazario*, 103 F.4th at 230 ("The unlawfulness of an official's conduct must be apparent in light of pre-existing law") (internal citations omitted).

As the Fourth Circuit has explained, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Benton*, 139 F.4th at 292 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)); *see Kisela*, 584 U.S. at 104; *Tarashuk v. Givens*, 53 F.4th 154, 162 (4th Cir.

---

[23] Defining the right at issue is not necessarily an easy task. In *Younger*, 79 F.4th 373, which involved the brutal beating of a prisoner by correctional officers, the district court defined the right at issue as a "prisoner's 'right to be protected from malicious attack . . . from the very officials tasked with ensuring their security.'" *Id.* at 386 n.20. But, the Fourth Circuit concluded that the district court's definition was too general. *Id.* According to the Fourth Circuit, the district court "failed to heed [the] requirement" of specificity. *Id.*

2022); *King*, 76 F.4th at 265–66. "'Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract facts.'" *Atkinson*, 100 F.4th at 506 (citation omitted). "In the end, the key inquiry is whether 'the law provided fair warning that [the officers'] conduct was unconstitutional.'" *Id.* at 506 (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017)) (additional citation and internal quotation marks omitted) (alteration in *Atkinson*); *see Thompson*, 878 F.3d at 98.

In assessing qualified immunity, a court in Maryland is guided by cases from the Supreme Court, the Fourth Circuit, and "the highest court of the state in which the action arose." *Thompson*, 878 F.3d at 98; *see Dean v. McKinney*, 976 F.3d 407, 417 (4th Cir. 2020). In the absence of controlling authority, the court considers "whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority." *Thompson*, 878 F.3d at 98 (internal quotation marks omitted). And, "even when the facts in the record establish that the [official's] conduct violated a plaintiff's constitutional rights, the [official] still is entitled to immunity from suit 'if a reasonable person in the [official's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Strickland*, 917 F.3d at 768; *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) But, the court cannot expect prison officials to possess "the legal knowledge culled 'by the collective hindsight of skilled lawyers and learned judges,' but instead only 'the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct.'" *Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007) (quoting *Jackson v. Long,* 102 F.3d 722, 731 (4th Cir. 1996)).

However, "[t]here is no requirement that the 'very action in question [must have] previously been held unlawful' for a reasonable official to have notice that his conduct violated that right." *Scinto*, 841 F.3d at 236 (second alteration in *Scinto*) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *see Quinn*, 111 F.4th at 294 (finding that a right need not have been recognized "on identical facts for it to be deemed clearly established"). Government officials "can still be on notice that their conduct violates established law even in novel factual circumstances, so long as the law provided fair warning that their conduct was wrongful." *Dean*, 976 F.3d at 418 (internal citation and quotation marks omitted); *see also Hope*, 536 U.S. at 741 (concluding that cases involving "fundamentally" or "materially similar" facts are not necessary to a finding that the law is clearly established); *Nazario,* 103 F.4th at 231 ("[T]he phrase clearly established will include not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked.") (internal quotation marks and citations omitted). The court "need not assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense." *Nazario*, 103 F.4th at 233 (citing *Strickland*, 917 F.3d at 770) (internal quotation marks omitted) (cleaned up).

Indeed, the second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other

57

hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818–19.

The question of qualified immunity may be decided at the summary judgment stage. *See Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003); *accord Saucier*, 533 U.S. at 200 ("Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." (internal quotation marks omitted)). However, "consideration of the qualified immunity question does not 'override the ordinary rules applicable to summary judgment proceedings.'" *Rambert*, 107 F.4th at 399 (quoting *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005); *see Pritchett,* 973 F.2d at 313 ("Because qualified immunity is designed to shield officers not only from liability but from the burdens of litigation, its establishment at the pleading or summary judgment stage has been specifically encouraged."); *see also Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579–80 (4th Cir. 2017) ("In this procedural posture, we may not credit defendant's evidence, weigh the evidence, or resolve factual disputes in the defendants' favor."). Thus, while the purely legal question of whether the constitutional right at issue was clearly established "is always capable of decision at the summary judgment stage," a genuine question of material fact regarding "whether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial." *Pritchett,* 973 F.2d at 313 (citing *Mitchell,* 472 U.S. at 526).

In other words, when a factual dispute "precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." *Willingham,* 412 F.3d at 560. The Fourth Circuit explained in *Hutcheson*, 80 F.4th at 515:

> [I]f, after construing the historical facts in favor of the non-moving party, the court determines the officers' conduct was unreasonable, summary judgment for the

officers is improper. The case would then proceed to trial for a jury to resolve not the ultimate question of the conduct's reasonableness—because that is a question for the court—but the disputes over any material historical facts.[] Then, after the jury resolves those disputes, the court decides the objective reasonableness of the officers' conduct. On the other hand, if at the summary judgment stage, the court decides the officers' conduct was reasonable—even when construing the historical facts in favor of the non-moving party—summary judgment is appropriate. In that situation, the factual dispute is not material because, even if the jury believes the nonmovant's version of events, no constitutional violation occurred.

Thus, the issue of qualified immunity is a question of law, but only when "the historical facts are sufficiently settled." *Rambert*, 107 F.4th at 396; *see Scott*, 550 U.S. at 381 n.8 ("At the summary judgment stage, . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, . . . the reasonableness of Scott's actions—or, in Justice STEVENS' parlance, [w]hether [respondent's] actions have risen to a level warranting deadly force [ ]—is a pure question of law."); *Hutcheson*, 80 F.4th at 513 ("When there is no dispute about the historical facts—the who, what, where and when of what happened—the objective reasonableness of officers' conduct is a matter of law to be decided by the court")).

**2.**

As discussed, a court's qualified immunity analysis involves two questions: (1) whether the facts, when considered "in the light most favorable to the party asserting the injury, . . . show [that] the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established." *Saucier*, 533 U.S. at 201. Answering either question in the negative warrants granting qualified immunity. *Nazario*, 103 F.4th at 230.

The Court has already determined that, viewing the facts in the light most favorable to Gregg, Strawderman's use of the figure-four leg lock was excessive. But, even if Strawderman

violated Davis's Fourth Amendment rights, he would be entitled to summary judgment "if those rights weren't clearly established." *Amisi v. Brooks*, 93 F.4th 659, 668 (4th Cir. 2024).

Of import, at the relevant time, Davis was not suspected of having committed a violent crime or a felony offense. Rather, he was arrested because he refused to leave his home pursuant to a protective order. And, Davis was detained because, at his bail hearing, the commissioner was concerned about his mental competency.

Strawderman knew that Davis was an unarmed, temporary detainee at BCDC. He also knew that Davis was experiencing mental health issues. In addition, at the relevant time, Davis was inside the facility, which would have limited his ability to flee. It was also apparent that Davis was elderly and small in stature. Moreover, when Strawderman applied the leg lock, Davis was already laying on the floor, face down; he was handcuffed behind his back; and he was restrained by two other officers.

I turn to define the right at issue, bearing in mind that the right must not be defined at "a high level of generality." *Kisela*, 584 U.S. at 104. As I see it, the right at issue is that of a detainee who is unarmed, handcuffed behind his back, experiencing an obvious mental health crisis, laying prone on the floor, restrained by two correctional officers, elderly, and slight in stature, not to be subjected to force of a kind that involved twisting his legs into a figure-four position. *See* ECF 44-1 at 28–29; ECF 48 at 18–19.

Viewing the facts in the light most favorable to plaintiff, as I must at this stage, I am satisfied that as of August 23, 2020, a reasonable officer would have been on notice that the conduct here would have violated Davis's right not to be subjected to the use of excessive force, by way of the figure-four leg lock. In reaching this conclusion, I rely on the cases that I previously reviewed, including *Armstrong*, 810 F.3d 892; *Meyers*, 713 F.3d 723; and *Rowland*, 41 F.3d 167.

60

Moreover, I have taken into account that, by 2020, the law had long been established in the Fourth Circuit that "it is objectively unreasonable for a police officer to apply additional force once an unarmed suspect is secured." *Brooks v. McKimmie*, DLB-23-0208, 2025 WL 1018882, at *13 (D. Md. Apr. 4, 2025).

To illustrate, in *Kane*, 987 F.2d 1005, decided in 1993, the Fourth Circuit recognized that it is clearly established that once a suspect, such as the 100-pound woman in *Kane*, is pinned to the ground, the officer should not use additional force to push her against the pavement—force that in *Kane* cracked the suspect's teeth. The Court said: "It would have been 'apparent' to a reasonable officer in [the defendant's] position that, after he had pinned to the ground a woman half his size and the woman did not pose a threat to him, it was unreasonable to push her face into the pavement with such force that her teeth cracked." *Id.* at 1008.

In *Bailey*, 349 F.3d 731, decided in 2003, it was deemed clearly established that the officers "were not entitled to use force after [the plaintiff] was secured face down on the floor in handcuffs and leg restraints," because the plaintiff was "unarmed", "had committed no crime", and the officers "had no reason to believe he was a danger to himself or others." *Id.* at 745. Moreover, the Court noted that "the use of force continued even after [the plaintiff] was secured with flex-cuffs around both his hands and his feet" and his hands were "bound behind his back." *Id.*

*Buchanan,* 325 F.3d at 520, another case decided in 2003, is also instructive. There, the Court concluded that the use of force was objectively unreasonable when the officer "severely injured [the plaintiff] by knocking him to the floor and jumping on him . . . ." *Id.* at 532. Jones, although drunk and using foul language, "was unarmed, handcuffed, and alone in a secured room in the sheriff's headquarters, having come there voluntarily and not under arrest or suspected of any crime." *Id.* In denying qualified immunity to the officer, the Court stated, *id.* at 534: "It was

61

clearly established that a police officer was not entitled to use unnecessary, gratuitous, and disproportionate force against a handcuffed, secured citizen, who posed no threat to the officer or others and had neither committed, nor was suspected of committing, any crime."

*Valladares*, 552 F.3d 384, was decided in 2009. There, the Fourth Circuit found it clearly established that an officer could not use "unnecessary, gratuitous, and disproportionate" force after the officer had the plaintiff "under full control" and in handcuffs, and the plaintiff had surrendered and was not resisting arrest. *Id.* at 390-91.

*Armstrong*, 810 F.3d at 892, which I reviewed at length earlier, is especially noteworthy. It was decided in January 2016, and is particularly useful in the context of an unarmed individual who is experiencing a mental health issue. Based on *Armstrong*, by August 2020, Strawderman had ample notice that "officers who encounter an unarmed and minimally threatening individual who is 'exhibit[ing] conspicuous signs that he [i]s mentally unstable' must . . . 'adjust the application of force *downward*.'" *Id.* at 900 (Citations omitted) (alterations in *Armstrong*) (emphasis added). The *Armstrong* Court determined that it is a constitutional violation to use "serious injurious force" on "a mentally ill man being seized for his own protection," who "was seated on the ground, was hugging a post to ensure his immobility, was surrounded by three police officers and two Hospital security guards,[] and had failed to submit to a lawful seizure for only 30 seconds." *Id.* at 906. As mentioned, the Court reasoned: "A reasonable officer would have perceived a static stalemate with few, if any, exigencies—not an immediate danger so severe that the officer must beget the exact harm the seizure was intended to avoid." *Id.*

Of course, there are factual distinctions between this case and the ones cited above, including *Armstrong*. These include that Davis was not tased. Nor was he seized merely "for his own protection," according to the defense. But, unlike in *Armstrong*, Davis was handcuffed at the

relevant time.  The distinctions in the cases do not undercut the salient point: there has long been notice to a law enforcement officer of a clearly established right of an unarmed person who is secured and experiencing mental health issues not to be subjected to the use of excessive force.

Moreover, a case on all fours is not required to show that a right is clearly established.  A law enforcement officer "can still be on notice that [his] conduct violates established law even in novel factual circumstances, so long as the law provided fair warning that their conduct was wrongful." *Dean*, 976 F.3d at 418.

In sum, Strawderman had ample notice that, based on the facts as alleged by plaintiff, the application of a figure-four leg lock after the third takedown constituted use of excessive force.

**3.**

"Determining whether a right is clearly established [and violated] cannot be done in isolation from the perceived facts of the case in which the immunity is claimed." *Somers,* 132 F.4th at 696.  Defendants insist that, based on the record, a jury could conclude that Davis posed a threat to the safety of the officers and/or others, because he "repeatedly refused to comply with orders, was actively resisting, and had bitten one officer and attempted to bite others."  ECF 50 at 4; *see* ECF 47-1 at 19.  And, according to defendants, Strawderman had been trained to perform the figure-four leg lock and had used it possibly hundreds of times.  ECF 47-1 at 19.

The clearly established right, as I defined it, turns on factual predicates, some of which are in dispute.  Summary judgment on qualified immunity grounds is improper where a genuine dispute of material fact remains as to whether an officer acted reasonably.  *See Bolick v. Anderson,* ___ F.4th ___, 2026 WL 706427, at *7 (4th Cir. Mar. 13, 2026) (reversing grant of summary judgment to defendant officers because there were genuine issues of material fact as to whether defendants violated plaintiff's clearly established rights); *Harris v. Pittman*, 927 F.3d 266, 281–

282 (4th Cir. 2019) (reversing grant of summary judgment to defendant officer because of genuine disputes of material pertinent to qualified immunity); *Connor*, 647 Fed. App'x at 239 (affirming district court's denial of defendants' summary judgment motion on qualified immunity grounds because the facts, viewed in the light most favorable to plaintiff, "would be sufficient to support a trier of fact's finding that shooting Carter amounted to excessive force . . ." and because "a reasonable officer would know that shooting Carter under the circumstances presented by [plaintiff's] version of the facts would be unlawful . . . ."); *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 180 (4th Cir. 1998) ("'[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants.'") (quoting *Buonocore v. Harris*, 65 F.3d 347, 359-60 (4th Cir. 1995)); *Cooper v. Doyle*, DKC-22-0052, 2024 WL 3568564, at *40–41 (D. Md. July 29, 2024) (denying summary judgment on qualified immunity because there was a genuine dispute as to whether defendant officers acted reasonably), *appeal dismissed in part and affirmed in part*, 163 F.4th 64 (4th Cir. 2025).

According to plaintiff, Davis was neither actively resisting nor aggressive. ECF 48 at 12. Indeed, plaintiff claims that "Davis's movements, that Defendants contend are resistive/assaultive, was [sic] indicative of a detainee experiencing mental distress, not combativeness." *Id.*

Davis is not available to testify. And, this Court must be "careful at summary judgment to avoid simply accepting an officer's self-serving statements and must consider all contradictory evidence." *Stanton*, 25 F.4th at 234. Nevertheless, the jury could credit the testimony of defense witnesses, who claim that Davis's conduct necessitated the use of force by Strawderman.

Genuine issues of material fact remain. Therefore, neither Strawderman nor plaintiff is entitled to summary judgment on the question of qualified immunity.

C.    Articles 24 and 26 of the Maryland Declaration of Rights (Count IV)

In Count IV, lodged pursuant to Articles 24 and 26 of the Maryland Declaration of Rights, plaintiff asserts: "Decedent Davis was further deprived of certain 'State Rights' established by way of Article 24 and 26 of the Maryland Declaration of Rights (in particular his right to the security of his person and his due process rights)." ECF 32, ¶ 142; *see id.* ¶¶ 141–144.  She maintains that Articles 24 and 26 should be considered *in pari materia* with their federal counterparts because the Maryland Declaration of Rights "mirrors the federal Constitution." ECF 44-1 at 29.  Therefore, plaintiff contends that she is entitled to summary judgment against Swanke, Fischer, and Strawderman with respect to Count IV. *Id.*

Defendants concede that the State constitutional claims apply the same standards as federal law. ECF 47-1 at 10 n.1.  But, they contend that they are entitled to judgment with respect to Count IV. *Id.* at 10.

Article 24 constitutes the State's constitutional guarantee of due process and equal protection of the law. *Town of Easton v. Pub. Serv. Comm'n*, 379 Md. 21, 41 n.11, 838 A.2d 1225, 1237 n.11 (2003).  That is, it "is the state law equivalent of the Fourteenth Amendment of the United States." *Hawkins v. Leggett*, 955 F. Supp. 2d 474 (D. Md. 2013) (quotation marks omitted); *see Meyers*, 981 F. Supp. 2d at 430.

Ordinarily, Article 24 is interpreted *in pari materia* with its federal analog. *See Littleton v. Swonger*, 502 F. App'x 271, 274 (4th Cir. 2012) (stating that Article 24 is "construed *in pari materia* with the . . . Fourteenth Amendment[ ]"); *Dent v. Montgomery Cty. Police Dept.*, 745 F. Supp. 2d 648, 661 (D. Md. 2010) (stating that Article 24 is "construed *in pari materia* with the . . . Fourteenth Amendment[ ]"); *Tyler v. City of College Park*, 415 Md. 475, 499–500, 3 A.3d 421, 435 (2010) (recognizing that Maryland courts "interpret Article 24 *in pari materia* with the

Fourteenth Amendment to the United States Constitution."); *Doe v. Dept. of Pub. Safety & Corr. Servs.*, 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009) (same).  "Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment."  *Hawkins,* 955 F. Supp. 2d at 496; *accord Frey v. Comptroller of Treasury,* 422 Md. 111, 176, 29 A.3d 475, 513 (2011) (quoting *Attorney Gen. of Maryland v. Waldron,* 289 Md. 683, 704, 426 A.2d 929, 941 (1981)).

It follows that the same standard of objective reasonableness applies to the analysis of an Article 24 claim as for analyzing a claim under the Fourteenth Amendment.  *Henry*, 652 F.3d at 536 (citing *Randall v. Peaco*, 175 Md. App. 320, 329, 927 A.2d 83, 89 (2007)); *see Beall v. Holloway-Johnson*, 446 Md. 48, 68, 130 A.3d 406, 417–18 (2016) ("The analysis for an Article 24 violation follows the analysis used for claims under the Fourteenth Amendment to the United States Constitution and, as a result, 'all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, . . . should be analyzed under the Fourth Amendment['s] reasonableness standard.'") (quoting *Okwa v. Harper,* 360 Md. 161, 204, 757 A.2d 118, 141 (2000)); *Espina v. Prince George's Cnty.*, 215 Md. App. 611, 654, 82 A.3d 1240, 1266 (2013) ("[A]n Article 24 claim is viable if a claimant can prove excessive force under the *Graham* test."), *aff'd sub nom. Espina v. Jackson*, 442 Md. 311, 112 A.3d 442 (2015)

Article 26 is the State's analog to the Fourth Amendment.  *Padilla v. State*, 180 Md. App. 210, 225, 949 A.2d 68, 77 (2008) (Hollander, J.); *see Dent*, 745 F. Supp. 2d at 661 ("Article 26 protects the same rights as those protected under the Fourth Amendment to the United States Constitution . . . .").  It, too, is construed *in pari materia* with its federal equivalent, *i.e.,* the Fourth Amendment.  *Lewis*, 98 F.4th at 530, n.4; *Padilla,* 180 Md. App. at 226, 949 A.2d at 78; *see, e.g., Parker v. State,* 402 Md. 372, 400, 936 A.2d 862, 878 (2007); *Patterson v. State,* 401 Md. 76,

66

113, 930 A.2d 348, 372 (2007); *Byndloss v. State,* 391 Md. 462, 465 n.1, 893 A.2d 1119, 1121 n.1 (2006); *Davis v. State,* 383 Md. 394, 408, 859 A.2d 1112, 1120 (2004); *Scott v. State,* 366 Md. 121, 139, 782 A.2d 862, 873 (2001); *Richardson v. McGriff,* 361 Md. 437, 452–53, 762 A.2d 48, 56 (2000); *Purnell v. State,* 171 Md. App. 582, 607, 911 A.2d 867, 882 (2006), *cert. denied,* 398 Md. 315, 920 A.2d 1060 (2007).  Therefore, Article 26 "'does not accord [a litigant] any greater protection than the Fourth Amendment to the United States Constitution.'" *Blasi v. State,* 167 Md. App. 483, 511 n.12, 893 A.2d 1152, 1168 n.12 (2006) (citation omitted), *cert. denied,* 393 Md. 325, 900 A.2d 751 (2007).

The parties agree that the Maryland Declaration of Rights is construed "*in pari materia* with [its] federal counterparts." ECF 44-1 at 29; *see also* ECF 47-1 at 10.[24]  Therefore, plaintiff may only prevail on her State constitutional claims if the force used by defendants was objectively unreasonable.  *See Meyers*, 981 F. Supp. 2d at 431–432; *Henry*, 652 F.3d at 531. The Court's analysis of plaintiff's federal constitutional claim controls the disposition of the claims under Articles 24 and 26 of the Maryland Declaration of Rights.

For the reasons stated earlier as to McKeiver, Swanke and Fischer, they are entitled to summary judgment with respect to plaintiff's claims in Count IV under the Maryland Declaration of Rights.  But, for the reasons advanced earlier, Strawderman is not entitled to summary judgment with respect to the claim of use of excessive force in connection with the third takedown.  On the other hand, when the evidence is viewed in Strawderman's favor, it provides a basis for concluding

---

[24] Although Articles 24 and 26 are interpreted *in pari materia* with their federal constitutional counterparts, the federal doctrine of qualified immunity is not a defense to claims brought under the Maryland Declaration of Rights.  *See, e.g.*, *Littleton*, 502 F. App'x at 274 n.2; *Richardson v. Orangeburg Sch. Dist. No. 1*, 53 F.3d 329 (table), 1995 WL 255941, at *3 n.2 (4th Cir. 1995); *Okwa*, 360 Md. at 201, 757 A.2d at 140; *Thacker v. City of Hyattsville*, 135 Md. App. 268, 290, 762 A.2d 172, 183–84 (2000).

that his conduct was objectively reasonable. Therefore, plaintiff is not entitled to summary judgment against Strawderman with respect to Count IV.

### D.   Battery (Count I) and Gross Negligence (Count II)

As to Count I, alleging battery, Gregg posits that she is entitled to summary judgment against Strawderman. ECF 44-1 at 29. According to plaintiff, Strawderman "utilized unnecessary and gratuitous force when he applied the figure-four leg lock during the third takedown" and therefore "[t]he uncontroverted evidence in this case compels a conclusion that Defendant Strawderman battered Philmore Davis." *Id.* at 30.

Count II asserts a claim for gross negligence. ECF 44-1 at 30. Plaintiff presents a parallel argument to that which she made for battery (Count I), claiming that Strawderman "utilized unnecessary and gratuitous force when he applied the figure four leg lock during the third takedown" and "his actions were not subject to any privilege." *Id.* at 31.

Defendants counter that all three defendants are entitled to summary judgment as to the claims of battery and gross negligence, because their actions were objectively reasonable. ECF 47-1 at 17. But, plaintiff has apparently abandoned these two claims as to all but Strawderman. Defendants also contend that plaintiff's claims for battery and gross negligence "rise and fall" with plaintiff's constitutional claims. *Id.* (citing *Neal v. Caplan*, BAH-22-1919, 2025 WL 608191, at *12 (D. Md. Feb. 25, 2025)).

"Battery [in Maryland] is commonly defined as a harmful, unlawful, or offensive touching." *Claggett v. State*, 108 Md. App. 32, 47, 870 A.2d 1002, 1009 (1996) (Hollander, J.) (citing *Ford v. State*, 330 Md. 682, 699, 625 A.2d 984, 992 (1993)). "An officer is not liable for battery for using a reasonable amount of force when effectuating a lawful detention or arrest." *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (citations omitted). "However, if

during a valid arrest 'an officer uses excessive force, or force greater than is reasonably necessary under the circumstances, the officer may be liable' for battery." *Id.* (quoting *French v. Hines*, 182 Md. App. 201, 266 957 A.2d 1000, 1037 (2008) (Hollander, J.)).

Therefore, "[t]o the extent that [a plaintiff] has stated a claim of excessive force under the Fourth Amendment," he also has "stated a claim for battery" under Maryland law. *Stutzman*, 350 F. Supp. 3d at 383; *see Rovin v. State*, 488 Md. 144, 321 A.3d 201, 227 (2024) ("Stated another way, we apply the same principles of 'objective reasonableness' underlying the application of a Section 1983 qualified immunity determination when considering whether a plaintiff's arrest was objectively reasonable, which would defeat the common law claims and constitutional claims arising from the same conduct as a matter of law.").

"Gross negligence is an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007) (quoting *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635, 495 A.2d 838, 846 (1985)); *see also State v. Kramer*, 318 Md. 576, 590, 569 A.2d 674, 681 (1990) (defining gross negligence as "a wanton or reckless disregard for human life."). "Only conduct that is of extraordinary or outrageous character will be sufficient to imply" that a person acted with gross negligence. *Kramer*, 318 Md. at 590, 569 A.2d at 681.

"Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case" and "is usually a question for the jury and is a question of law only when reasonable [people] could not differ as to the rational conclusion to be reached." *Romanesk*, 248 Md. at 423 (citations omitted). "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a

defendant's negligent conduct amounts to gross negligence." *Taylor v. Harford Cnty. Dep't of Social Servs.*, 384 Md. 213, 229, 862 A.2d 1026, 1034 (2004) (citation and internal quotation marks omitted).

"In the context of gross negligence claims alleging excessive force, the Maryland Court of Appeals[25] has held that the principle of objective reasonableness as articulated in *Graham* 'controls.'" *Stutzman*, 350 F. Supp. 3d at 383 (quoting *Richardson*, 762 A.2d at 56); *see also Torbit v. Baltimore City Police Dep't*, 231 Md. App. 573, 153 A.3d 847, 858 (2017). In other words, a court analyzes "gross negligence premised on excessive force" claims using "the same standard as it would to analyze an excessive force claim brought under the federal Constitution." *Brown v. Maryland*, SAG-25-01331, 2025 WL 2855770, at *15 (D. Md. Oct. 8, 2025) (denying motion to dismiss, in part, reasoning that "[b]ecause this Court has concluded that Plaintiff has stated an excessive force claim under the Fourth Amendment, she has also stated an excessive force claim under Articles 24 and 26 and claims for battery and gross negligence") (citing *Est. of Blair v. Austin*, 469 Md. 1, 22–23, 28 A.3d at 1106 (2020)); *cf. Pagotto v. State*, 127 Md. App. 271, 348, 732 A.2d 920, 961 (1999) ("A police action deemed to be reasonable in the § 1983 context could clearly not be the basis for a finding of gross criminal negligence on the part of the officer."), *aff'd*, 361 Md. 528, 762 A.2d 97 (2000).

---

[25] In the Maryland general election in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. I shall refer to the courts by the names that were in effect when the cited decisions were issued.

I conclude that neither plaintiff nor Strawderman is entitled to summary judgment with respect to plaintiff's claims of common law battery and gross negligence. As I previously determined, the evidence, when viewed in the light most favorable to plaintiff, provides a basis for concluding that Strawderman used excessive force. But, when the evidence is viewed in Strawderman's favor, it provides a basis for concluding that Strawderman's conduct was objectively reasonable.

However, McKeiver, Swanke, and Fischer are entitled to summary judgment with respect to plaintiff's claims of battery and gross negligence. Plaintiff provides no argument or evidence as to how McKeiver, who was only present during the first takedown, engaged in objectively unreasonable conduct. Nor does the record contain sufficient evidence to demonstrate that the conduct of Swanke or Fischer was objectively unreasonable. Therefore, I shall grant Defendants' Motion as to McKeiver, Swanke, and Fischer with respect to Count I and Count II.

## IV. Plaintiff's Motion to Strike

Plaintiff has moved to strike defendants' expert report and testimony of defendants' jail operations expert, Jeff Eiser, pursuant to Federal Rules of Civil Procedure 26(2)(a) and 37(c)(1). ECF 49. According to plaintiff, to allow Eiser to serve as an expert witness at trial would prejudice plaintiff, because she did not receive Eiser's expert report until she received Defendants' Motion, to which the report was appended. ECF 49, ¶ 18. In Defendants' Opposition to Motion to Strike, they argue that plaintiff will suffer no prejudice if Eiser is permitted to serve as a defense expert. ECF 51 at 2.

### A. Factual Background

Under the applicable Scheduling Order, defendants were required to disclose their experts to plaintiff by March 17, 2025. ECF 24 (Scheduling Order); ECF 37 (Order Granting Defendants'

Motion to Modify Scheduling Order), at 1.[26]   But, plaintiff contends, and defendants do not dispute, that she did not receive Eiser's expert report until it was submitted with Defendants' Motion on June 25, 2025.  *See* ECF 47-9 at 23–57.

According to plaintiff, defendants neither disclosed Eiser as an expert prior to defendants' expert designation deadline, nor identified Eiser in response to plaintiff's written discovery requests, which should have triggered such information.  ECF 49, ¶¶ 2, 8–11.  In contrast, defendants' counsel disclosed defendants' other expert, Dr. Kraut, on March 18, 2025, and provided plaintiff with his expert report on that date, one day after the deadline of March 17, 2025.  *Id.* ¶ 7; *see* ECF 49-3 (correspondence between parties regarding Kraut expert report, dated March 18, 2025).

Eiser's expert report is signed and dated February 12, 2025.  ECF 47-9 at 57.  In other words, it was prepared at least one month before the disclosure deadline.  Upon receiving Defendants' Motion and Eiser's expert report on June 25, 2025, plaintiff's counsel contacted defendants' counsel.  ECF 49, ¶ 15; *see* ECF 49-11 at 1–2.  Defendants' counsel responded that Eiser's report was mailed to plaintiff's counsel's office on or around February 13, 2025.  ECF 49-11 at 1–2.  Despite plaintiff's request for confirmation of such transmission, plaintiff contends that, to date, defendants' counsel has not provided any receipts of transmission of Eiser's report to plaintiff.  ECF 49, ¶¶ 16–17.  Curiously, the defense has not provided the Court with any proof of transmission on or about February 13, 2025.

Eiser is a critical witness to the defense.  In his view, defendants' use of force was reasonable and BCDC personnel took reasonable steps to protect Davis from harm.  ECF 47-9 at 55.  Eiser avers: "It is my opinion, from a jail operational perspective, any injury (no matter how

---

[26] Plaintiff was ordered to do the same by March 31, 2025.  ECF 37 at 1.

or when it actually occurred) suffered by Mr. Davis on August 23, 2020 was an isolated, tragic, and unforeseeable event which happened in spite of the reasonable efforts of BCDC supervision and staff (including Sgt. Eric Strawderman, Sgt. Christopher Fischer, Corrections Officer Devin McKeiver, and Corrections Officer Matthew Swanke)." *Id.* Further, he opines that defendants' actions, "as a result of the active resistance and aggression of Mr. Davis, were objectively reasonable, necessary and appropriate based upon the information jail staff had at the time, and were directly related to a legitimate penological interest of staff/inmate safety, and consistent with their own policies and procedures, the Adult Detention Centers Standards Manual promulgated by the Maryland Commission on Correctional Standards, and clearly established corrections industry standards and practices." *Id.* at 56.

Plaintiff argues that defendants' failure to timely provide Eiser's expert report prejudiced plaintiff because the deposition deadline has passed. *Id.* ¶ 18. Thus, plaintiff asks the Court to bar defendants from calling Eiser as an expert witness at trial. *Id.* ¶¶ 18–22.

Defendants do not contend that they provided plaintiff with Eiser's expert report in accordance with the Court's deadline. ECF 51 at 1. Indeed, they have not offered any explanation to the Court for their conduct in flouting the deadline set by the Court. Instead, defendants argue that, "even if true", plaintiff did not suffer actual prejudice because plaintiff never deposed defendants' other expert, Dr. Kraut. *Id.* Moreover, defendants argue that defense counsel was amenable to an extension of the discovery deadline to permit plaintiff to depose Eiser. *Id.* at 2.

### B.  Standard of Review

Pursuant to Fed. R. Civ. P. 26(a)(2)(A), "a party must disclose" to its adversary "the identity of any witness it may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705." If the witness is retained to provide expert testimony, the disclosure must be accompanied

by a written report, prepared and signed by the witness, and include the following, pursuant to Rule P. 26(a)(2)(B):

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Notably, this disclosure must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Further, "[f]or an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2).

If a court finds that a party's expert disclosure was untimely, the court must then determine the appropriate sanction. Fed. R. Civ. P. 37(c)(1) provides that if a party fails to disclose a witness pursuant to Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In addition to, or in lieu of exclusion, after providing an opportunity to be heard, Rule 37(c)(1)(A) permits the court to "order payment of the reasonable expenses, including attorney's fees, caused by the failure[.]"

"[T]he basic purpose of Rule 37(c)(1)" is "preventing surprise and prejudice to the opposing party." *S. States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003). Rule 37 "'gives teeth' to the Rule 26(a)(2) requirements by 'forbidding a party's use of improperly disclosed information at a trial, at a hearing, or on a motion, unless the party's failure to disclose is substantially justified or harmless.'" *Barnett v. United States*, DCN-20-2517, 2021 WL 5888542, at *2 (D.S.C. Dec. 13, 2021) (quoting *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1365 (Fed. Cir. 2011)).

The Fourth Circuit has emphasized that Rule 37(c)(1) imposes an "'automatic sanction' of exclusion," and that the "general rule" is that evidence that a party has "failed to properly disclose" should be excluded. *S. States Rack and Fixture, Inc.*, 318 F.3d at 595 n.2, 596 (quoting 1993 Advisory Committee Note to Fed. R. Civ. P. 37). This is because "[a] party that fails to provide [Rule 26] disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case." *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278–79 (4th Cir. 2005).

"The only exceptions to exclusion [under Rule 37(c)(1)] are when the nondisclosure is substantially justified or harmless." *Contech Stormwater Solutions, Inc. v. Baysaver Techs., Inc.*, 534 F. Supp. 2d 616, 623 (D. Md. 2008). And, "[t]he party failing to disclose information bears the burden of establishing that the nondisclosure was substantially justified or was harmless." *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 190 (4th Cir. 2017).

The court has "broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis." *S. States Rack and Fixture, Inc.*, 318 F.3d at 597. In making this determination, the court is guided by the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2)

75

the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Id.*; *see Bresler*, 855 F.3d at 190; *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014). Moreover, "Rule 37(c)(1) does not require a finding of bad faith or callous disregard of the discovery rules." *S. States Rack and Fixture, Inc.*, 318 F.3d at 596.

The first four factors "relate primarily to the harmlessness exception" of Rule 37(c)(1), and the fifth factor "relates mainly to the substantial justification exception." *Bresler*, 855 F.3d at 190. But, a district court is "not *required* to tick through each of the *Southern States* factors." *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) (emphasis in original); *accord Benjamin v. Sparks*, 986 F.3d 332, 343 (4th Cir. 2021); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 330 (4th Cir. 2011). Instead, "[d]istrict courts are accorded 'broad discretion' in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless." *Bresler*, 855 F.3d at 190 (quoting *Wilkins*, 751 F.3d at 222).

As noted, the defense disregarded the disclosure deadline set forth in the Scheduling Order. *See* ECF 37. Scheduling orders serve a vital purpose in helping a court to manage its civil caseload. *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D. Me. 1985); *see also Naughton v. Bankier*, 114 Md. App. 641, 653, 691 A.2d 712, 718 (1997) (recognizing that a scheduling order helps "to maximize judicial efficiency and minimize judicial inefficiency"). A scheduling order is not a "'frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" *Potomac Electric Power Co. v. Electric Motor Supply, Inc.*, 190 F.R.D. 372, 375-76 (D. Md. 1999). To the contrary, a scheduling order is an important vehicle in "'securing the just, speedy, and inexpensive determination of every action.'" *Miller v. Transcend Servs., Inc.*,

76

LPA-10-362, 2013 WL 1632335, at *4 (M.D.N.C. Apr. 16, 2013) (quoting *Marcum v. Zimmer*, 163 F.R.D. 250, 253 (S.D.W.Va. 1995)).

To be sure, Fed. R. Civ. P. 16 "recognize[s] . . . that the parties will occasionally be unable to meet . . . deadlines [in a scheduling order] because scheduling order deadlines are established relatively early in the litigation." *O'Connell v. Hyatt Hotels of Puerto Rico*, 357 F.3d 152, 154 (1st Cir. 2004) (citation omitted). But, a filing made after a deadline set forth in a court's scheduling deadline amounts to a request for modification of the scheduling order, which "may be modified only for good cause and with the judge's consent." See Fed. R. Civ. P. 16(b)(4).

The importance of a scheduling order is reflected in the fact that good cause is required to modify a scheduling order.  See Fed. R. Civ. P. 16(b)(4).  The "'touchstone'" of Rule 16(b)(4)'s "good cause requirement is 'diligence.'"  *Faulconer v. Centra Health*, 808 Fed. App'x 148, 152 (4th Cir. 2020) (citation omitted). Indeed, "only diligent efforts to comply with the scheduling order can satisfy Rule 16's good cause standard." *Id*. at 152.  The Fourth Circuit has endorsed this proposition several times, in line with other circuits.  *Id*. at 152 n.1 (collecting cases); *accord Rassoull v. Maximus, Inc*., 209 F.R.D. 372, 374 (D. Md. 2002) ("Lack of diligence and carelessness are 'hallmarks of failure to meet the good cause standard.'") (citation omitted).

## C.  Analysis

In making the determination as to whether defendants' failure to timely disclose Eiser was "substantially justified or harmless," I am guided by the *Southern States* factors.  *S. States Rack and Fixture, Inc.*, 318 F.3d at 597.  Defendants have failed altogether to show that their conduct was justified.  Indeed, it is concerning that they have made no effort to explain to the Court why Eiser's expert report was not timely provided to plaintiff, in flagrant disregard of the Scheduling Order.  With respect to the other factors, defendants declare that "[s]urprise here is inapplicable"

and "the expert Plaintiff seeks to exclude is the only expert Defendants have to counter Plaintiff's corrections expert."  ECF 51 at 2–3.

Defendants' disclosure delay of more than three months, and after discovery closed, coupled with the lack of any explanation for the failure to timely disclose Eiser's report, argues in favor of exclusion.  *See Sanchez Carrera v. EMD Sales, Inc.*, 402 F. Supp. 3d 128, 138 (D. Md. 2019) (granting motion to strike where defendants introduced new evidence with their summary judgment motion and failed to provide any explanation for their untimely production).  On the other hand, I cannot ignore that no trial date has yet been set.  And, of course, the Court can provide plaintiff with an opportunity to depose Eiser and, if desired, to identify a rebuttal expert.

As indicated, a court has "broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis." *S. States Rack and Fixture, Inc.*, 318 F.3d at 597. In my view, defendants' untimely disclosure of Eiser was not substantially justified.  I will not consider the expert on summary judgment, because that would be completely unfair to plaintiff.

But, given that no trial date has yet been set, any prejudice to plaintiff can be cured by permitting plaintiff to depose the expert and to retain a rebuttal expert, if she so chooses.  If plaintiff elects to name a rebuttal expert, no deposition of the rebuttal expert will be permitted.  However, an expert report will be required, in accordance with Fed. R. Civ. P. 26(a)(2)(B).  And, given what transpired, I will award reasonable legal fees to plaintiff in connection with the Motion to Strike, pursuant to Rule 37(c).

## V.  Conclusion

For the foregoing reasons, I shall deny Plaintiff's Motion.  I shall grant Defendants' Motion in part and deny Defendants' Motion in part.  In particular, with regard to Strawderman, I shall

78

deny Defendants' Motion in its entirety. As to McKeiver, Swanke, and Fischer, I shall grant Defendants' Motion with respect to Count I (battery); Count II (gross negligence); Count III; and Count IV. Because no claims against McKeiver, Swanke or Fischer remain, they shall be dismissed from the suit. Further, with respect to Plaintiff's Motion to Strike, I shall deny it.

An Order follows, consistent with this Memorandum Opinion.

Date: March 18, 2026                          _____/s/_____

Ellen Lipton Hollander
United States District Judge

| ECF Number | Exhibit |
| --- | --- |
| | **EXHIBIT APPENDIX**<br>Verna Gregg, as Personal Representative of the Estate of Philmore Roy Davis<br>*v.* Sergeant Eric Strawderman, *et al.*,<br>ELH-23-2270 |
| ECF 44-1 | Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment |
| ECF 44-2 | Baltimore County Detention Center ("BCDC") Full Patient History |
| ECF 44-3 | McKeiver Deposition |
| ECF 44-4 | Fischer Deposition |
| ECF 44-5 | Strawderman Deposition |
| ECF 44-6 | Baltimore County Police Department Incident Report |
| ECF 44-7 | District Court for Baltimore County Temporary Commitment |
| ECF 44-8 | Fischer Intra-Department Correspondence |
| ECF 44-9 | Swanke Deposition |
| ECF 44-10 | Davis Transportation Log |
| ECF 44-11 | BCDC Video Footage |
| ECF 44-12 | BCDC Shift Narrative |
| ECF 44-13 | McKeiver Force Report |
| ECF 44-14 | Swanke Force Report |
| ECF 44-15 | Swanke Supplement to Incident Report |
| ECF 44-16 | Swanke Intra-Department Correspondence |
| ECF 44-17 | Fischer Force Report |
| ECF 44-18 | Fischer Intra-Department Correspondence |
| ECF 44-19 | Strawderman Force Report |
| ECF 44-20 | Strawderman Intra-Department Correspondence |
| ECF 44-21 | Sarkar Expert Report |
| ECF 44-22 | Stevens Deposition |
| ECF 44-23 | Baltimore County Fire Department Ambulance Report |
| ECF 44-24 | Hawkins Deposition |
| ECF 44-25 | Greater Baltimore Medical Center Medical Records |
| ECF 44-26 | University of Maryland Medical Center Medical Records |
| ECF 47-1 | Defendants' Memorandum of Law in Support of Motion for Summary Judgment and Opposition to Plaintiff's Motion for Partial Summary Judgment |
| ECF 47-2 | McKeiver Deposition |
| ECF 47-3 | Swanke Deposition |
| ECF 47-4 | Fischer Deposition |
| ECF 47-5 | Strawderman Deposition |
| ECF 47-8 | Hawkins Deposition |
| ECF 47-9 | Kraut and Eiser Expert Reports |

| ECF 48-1 | Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment and Opposition to Defendants' Motion for Summary Judgment |
|---|---|
| ECF 48-4 | McManimon Expert Report |
| ECF 49-1 | Plaintiff's Motion to Strike Defendants' Expert Report of Jeff Eiser |
| ECF 49-3 | Parties' Correspondence Regarding Kraut Expert Report |
| ECF 49-11 | Parties' Correspondence Regarding Eiser Expert Report |
| ECF 50 | Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment |
| ECF 51 | Defendants' Opposition to Plaintiff's Motion to Strike Defendants' Expert Report of Jeff Eiser |